UNITED STATES v. MATSON NAV. CO. et al.

THE LOUIE III.

No. 12902.

United States Court of Appeals Ninth Circuit.

Jan. 19, 1953.

Holmes Baldridge, Asst. Atty. Gen., Henry L. Hess, U. S. Atty., Portland, Or., Leavenworth Colby and Keith R. Ferguson, Sp. Assts. to Atty. Gen., for appellant.

Gunther F. Krause, Arthur S. Vosburg, Frank McK. Bosch and F. E. Wagner, Portland, Or., for appellees.

Before STEPHENS, HEALY, and BONE, Circuit Judges.

STEPHENS, Circuit Judge.

A unique body of law particularly appropriate to the regulation and settlement of the special problems arising out of sea navigation and commerce has been developed for the "men who go down to the sea in ships" and for the merchants who use the waterways of the world as highways. The maritime law has grown from ancient times to the present day, changing with changing times to meet the objective of common justice. Landlubber courts, nurtured in the common law of their several countries, early conceded litigation relating to the sea to a specialty court commonly called "Court of Admiralty". Civilization has not progressed evenly with all peoples and the border separating right from wrong, or justice from injustice, is neither definite nor static. Hence, "[t]he precise scope of admiralty jurisdiction is not a matter of obvious principle or of very accurate history". The Blackheath, 1904, 195 U.S. 361, 365, 25 S.Ct. 46, 47, 49 L.Ed. 236.

When the creation of a supreme sovereignty by the compact of thirteen sovereign states was memorialized by the *Constitution* of the United States, admiralty law was therein recognized as a national

interest and "all Cases of admiralty and maritime Jurisdiction" [1] were vested within the judicial power as exercised by the Supreme Court and "such inferior Courts as the Congress may from time to time ordain and establish." [2] What constituted an "admiralty" or "maritime" case, the founding fathers did not say, but they must have intended those words as embracing the broad subject matter of maritime law according to the general practices relating to it and at all times subject to definite provision by Congress and judicial decision within the reasonable scope of the terms used.

When the first Congress undertook to establish the federal courts under the mandate of Article 3, Section 1, of the *Constitution*, it apparently acted with the intent to avoid a repetition of the historical conflict which resulted from the competition for jurisdiction between the English common law and admiralty courts,[3] for it bestowed both the common law jurisdiction and "all civil causes of admiralty and maritime jurisdiction" upon the United States district courts, "saving to suitors, in all cases, the right of a common law remedy, where the common law is competent to give it".[4] Judiciary Act of 1789, 1 Stat. 73, 77, 28 U.S.C.A. § 1333(1). But the distinctions between the common law and the admiralty law remained, each following its own rules, remedies and precedents. And as the differences remained, so did the necessity for determining which body of law was to govern in a particular case. But Congress still gave no definition to the scope of the maritime law. Consequently it remained for the court in each case before it to determine whether the facts reasonably fell within the compass of the Constitutional provision.

### The Facts of the Instant Case

In December, 1946, the Tug Louie III, owned by the Westport Towboat Company, with a raft in tow, fouled the Dredge Multnomah, a donkey scow and pipeline, all owned by the United States, on the Columbia River within the State of Oregon. Shortly thereafter, the S. S. Hardy, operated by the Matson Navigation Company and piloted by W. R. Eckhart, while proceeding on a downstream course in an attempt to pass the dredge, tug, and tow, collided with and damaged a dike, identified as Dike 67–1, owned and maintained by the United States. Dike 67–1 was constructed of piling and was admittedly attached to the shore. The United States sought to invoke the admiralty jurisdiction of the United States District Court for the District of Oregon by libeling the Tug in rem and the Westport Towboat Company in personam for a maritime tort to the dredge, donkey scow, pipeline, and appurtenant equipment; by libeling the Tug in rem, and the Westport Towboat Company together with the Matson Navigation Company and the pilot Eckhart in personam for a maritime tort to the dike; and by libeling the Tug in rem to recover the damages and statutory penalty provided by the Rivers and Harbors Act of 1899, Title 33 U.S.C.A. § 407 et seq. The libels were joined in one action. The respondents excepted individually and on various separate grounds, but all joined in challenging the admiralty jurisdiction over the tort to the dike for the reasons that the dike was a land structure and the damage occurred in 1946 prior to the enactment of the Shore Damage Act of June 19, 1948, 46 U.S.C.A. § 740. Respondents further challenged the constitutionality of the Shore Damage Act and

1. Art. 3, § 2, Constitution, U.S.C.A.

2. Art. 3, § 1, Constitution, U.S.C.A.

3. And perhaps, to some degree, it sacrificed some of the advantages which might be gained from a court comprised of specialists.
   The history and development of the restrictions placed on the jurisdiction of the admiralty courts in England by kings, parliament, the common law courts, and especially Lord Coke, are set forth in Waring v. Clarke, 1847, 5 How. 441, particularly in Justice Woodbury's dissent beginning at page 467, 12 L.Ed. 226.

4. Thus, there are certain areas where a plaintiff has a choice of proceeding under the common law or in admiralty.

disclaimed any liability under Title 33 U.S. C.A. §§ 408 and 412.

A preliminary pre-trial hearing on the jurisdictional questions was had. The court found that prior to the enactment of the Shore Damage Act a court sitting in admiralty had no jurisdiction over a tort to a dike and that the Shore Damage Act, enacted June 19, 1948, had no retroactive application to an accident which occurred on December 21, 1946. The court further found it had no admiralty jurisdiction to entertain a claim for damages and penalties under the Act of March 3, 1899, 33 U.S. C.A. § 411, for damages to the dike. The libel was dismissed as to respondents Matson Navigation Company, the pilot Eckhart, the Westport Towboat Company and the Tug insofar as claims growing out of the damage to the dike and the Rivers and Harbors Act of March 3, 1899 were alleged therein. Libelant was given twenty days to file an amended libel in admiralty against the Towboat Company and Tug, confining its claim of damage to the Dredge Multnomah. The United States appealed.

## Jurisdiction of Admiralty Courts

■ An essential to the jurisdiction of the admiralty courts over a tort is that it was committed in relation to navigable waters. 1 Benedict on Admiralty, 6th Ed., § 127 et seq.; The Plymouth, 1865, 3 Wall. 20, 33, 18 L.Ed. 125. Admiralty jurisdiction extends to every species of tort committed upon the high seas or on navigable waters. The Plymouth, supra, 3 Wall. at page 34, 18 L.Ed. 125. The fact that the alleged tort in the instant case occurred upon the Columbia River and not a sea would not be a basis for denying the jurisdiction of the admiralty courts, since the river at the place of collision is navigable.[5] Waring v. Clarke, 1847, 5 How. 441, 12 L. Ed. 226. See also Fretz v. Bull, 12 How. 466, 13 L.Ed. 1068; The Magnolia, 20

How. 296, 15 L.Ed. 909; The Daniel Ball, 10 Wall. 557, 19 L.Ed. 999 (river entirely within State of Michigan); The Montello, 20 Wall. 430, 22 L.Ed. 391 (river entirely within State of Wisconsin and interrupted by rapids); Escanaba & L. M. Transp. Co. v. City of Chicago, 107 U.S. 678, 2 S.Ct. 185, 27 L.Ed. 442 (Chicago River); The Robert W. Parsons, 1903, 191 U.S. 17, 24 S.Ct. 8, 48 L.Ed. 73 (Erie Canal).

■ However, respondents do contend that damage to a dike is not a maritime tort since a dike is a continuation of the land. In general, injury to an extension of the land is not within the admiralty jurisdiction. The Plymouth, supra. The Plymouth doctrine sprang from a case concerning the spread of a fire to a wharf to which a ship was tied. The court there held that although the origin of the wrong was on navigable water, "the substance and consummation of the injury [was] on land", and therefore, beyond the cognizance and jurisdiction of the admiralty courts. The doctrine has been applied to damage by a ship to a bridge, Cleveland T. & V. R. Co. v. Cleveland S. S. Co., 1908, 208 U.S. 316, 28 S.Ct. 414, 52 L.Ed. 508; The Troy, 1908, 208 U.S. 321, 28 S.Ct. 416, 52 L.Ed. 512; to a building on the shore, Ex parte Phenix Insurance Co., 1886, 118 U.S. 610, 7 S.Ct. 25, 30 L.Ed. 274; and to many other structures said to be extensions of the land. See 1 Benedict on Admiralty, 6th Ed., § 128a.

The rule laid down in The Plymouth was qualified by the Supreme Court in The Blackheath, 1904, 195 U.S. 361, 25 S.Ct. 46, 48, 49 L.Ed. 236. The facts in that case concerned a vessel which struck and damaged a beacon in the Mobile, Alabama, ship-channel. The court held that the injury had been "to a government *aid to navigation* from ancient times subject to the admiralty,—a beacon emerging from the water,—injured by the motion of the ves-

---

**5.** The English precedents confining the admiralty jurisdiction to the acts occurring upon the sea or upon waters within the ebb and flow of the tide, followed by the Supreme Court in The Thomas Jefferson, 10 Wheat. 428, 6 L. Ed. 358, were flatly overruled in The Genesee Chief, 1851, 12 How. 443, 13 L. Ed. 1058, for the reason that in England tide water was synonymous with navigable water, while on the American continent the mighty rivers and lakes were navigable for great distances beyond the reach of tide water.

sel, by a continuous act, beginning and consummated upon navigable water, and giving character to the effects upon a point which is only technically land, through a connection at the bottom of the sea." [Emphasis ours.] At page 367 of 195 U.S., at page 48 of 25 S.Ct., Justice Brown, in his separate concurring opinion, suggested that the decision of the court in The Blackheath overruled The Plymouth doctrine. However, Justice Brown's view was not accepted, and The Blackheath situation became only a limitation upon The Plymouth doctrine,[6] while cases of injury to shore structures or extensions of the land by ships remained beyond the scope of admiralty jurisdiction in the United States. See, e.g., The Admiral Peoples, 1935, 295 U.S. 649, 55 S.Ct. 885, 79 L.Ed. 1633.

The damaged dike which is the subject of the instant litigation was made of wooden pilings extending northerly from the Oregon shore in the lower Columbia River. The purpose of the dike was to force the river's water into a narrower channel, thereby increasing the speed of the flow and preventing the deposit of silt on the river bed. The dike thus served as part of the government's project for dredging the Columbia River channel and for keeping the river navigable. It might, therefore, be suggested that the dike served as an "aid to navigation" in that it made the channel deeper and consequently less dangerous, and that injury to the dike would be within the jurisdiction of the admiralty courts under the rule announced in The Blackheath, as opposed to The Plymouth doctrine. However, the Supreme Court specifically considered this question and held that just such a dike was not an "aid to navigation", and therefore not subject to the admiralty jurisdiction of the United States district courts. The Panoil, 1925, 266 U.S. 433, 45 S.Ct. 164, 69 L.Ed. 366. Apparently The Blackheath doctrine differentiates between a structure which aids the act of navigation and one which aids in the navigability of waters.

Since it is established that Dike 67–1 was an extension of the land, an alleged injury to it which occurred in 1946 was not within the then recognized area wherein the United States district courts would exercise their admiralty jurisdiction. However, on June 19, 1948, Congress enacted the Admiralty Extension Act which provided as follows:

"The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused *by* a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land. * * *" [Emphasis ours.] 62 Stat. 496, 46 U.S.C.A. § 740.

Before turning to the question of whether the Admiralty Extension Act applies to a tort committed prior to its enactment, we shall consider the constitutionality of the Act.

### Constitutionality of the Admiralty Extension Act

The *Constitution* confers upon the United States courts "all Cases of admiralty and maritime Jurisdiction". There is no limitation on the grant beyond that contained in the definition of the words "admiralty" and "maritime". It is suggested in Waring v. Clarke, 1847, 5 How. 441, 457, 12 L.Ed. 226, that the definitions of those words are not to be confined to the meanings given them by the English courts at the time the *Constitution* was adopted, since the grant of admiralty jurisdiction by the *Constitution* to the courts was intended to be a synthesis of what the delegates to the convention, which reported out a constitution, knew were within the admiralty jurisdiction in England and in the United States immediately prior to 1789. And in The Genesee Chief, 1851, 12 How. 443, 453, 13 L.Ed. 1058, the Supreme Court, in considering the constitutionality of an Act of Congress which purportedly extended the admiralty jurisdiction of the United States

---

**6.** Another example of admiralty jurisdiction over a tort involving both maritime and littoral objects occurs in the situation where the damage is caused

*to* a ship *by* a bridge or other land structure. See 1 Benedict on Admiralty, 6th Ed., § 128b, and cases cited therein.

courts to inland lakes and navigable waters connecting them,[7] said that the Act could be sustained only if it was "within the scope of admiralty and maritime jurisdiction, as known and understood in the United States when the Constitution was adopted". In upholding the Act, the court said 12 How. at page 454, 13 L.Ed. 1058, that to do otherwise would be to deny rights to citizens of the inland states and would thus be contrary to the "intention of the framers of the Constitution" and would "necessarily produce great public inconvenience."

In his classic discussion and analysis of the admiralty law, Justice Story rejects as limitations to the constitutional scope of admiralty jurisdiction of federal courts in the United States the admiralty jurisdiction exercised by the English admiralty courts at the time of the American Revolution or at the time of the emigration of our ancestors from England. Nor, he continues, is the scope of the admiralty jurisdiction conferred by the *Constitution* confined to the jurisdiction which was actually exercised in the English colonies which joined to form the United States, since the admiralty jurisdiction of the Colonies was limited by the grants of the English masters. He suggests rather that the Constitutional grant must be liberally construed to encompass all that can be included in the ancient laws, customs, and usages of the sea, not only in England before the restrictive statutes were passed, but also in the maritime courts of all the other powers of Europe. Moreover, he points out that the grant of jurisdiction not only uses the word "admiralty" but also the word "maritime", and must there include "jurisdiction of all things done upon and relating to the sea * * *."[8] De Lovio v. Boit, 1815, 7 Fed. Cas. pages 418, 419, 441, 442, No. 3,776, 2 Gall. 398.

Damage to a land structure by a ship, historically and through experience and usage, has been generally made cognizable in foreign maritime courts. The jurisdiction of the English admiralty courts over such torts, after centuries of prohibition by the kings, common law courts, and Parliament, was restored in 1861. And injuries to shore structures by ships have long been recognized as maritime torts by the Continental courts.[9] As the Supreme Court said in The Blackheath, supra, 195 U.S. at page 365, 25 S.Ct. at page 47, 49 L.Ed. 236, "there seems to be no reason why the fact that the injured property was afloat should have more weight in determining the jurisdiction than the fact that the cause of the injury was." Cf. note 6, supra.

Since the "Constitution does not prohibit what convenience and reason demand. * * * it would be a strong thing to say that Congress has no constitutional power to give the admiralty here as broad a jurisdiction as it has in England or France". The Blackheath, supra, 195 U.S. at pages 367, 364, 25 S.Ct. at pages 48, 49 L.Ed. 236.

While the *exercise* of the admiralty jurisdiction by the United States courts did not extend to injuries caused by ships to land structures prior to the passage of the Admiralty Extension Act in 1948, we are of the opinion that such accidents are both reasonably and historically within the concept of maritime affairs, The Barlum, 293 U.S. 21, 45, 55 S.Ct. 31, 79 L.Ed. 176, and were, therefore, within "the admiralty and maritime jurisdiction, as known and understood in the United States when the Constitution was adopted." The Genesee

---

7. 5 Stat. 726, Act of February 26, 1845.

8. "or, in other words, all transactions and proceedings relative to commerce and navigation, and to damages or injuries *upon* the sea." [Emphasis ours], 7 Fed. Cas. at page 441, No. 3,776.

9. See, e. g., the *Ordonnance de la Marine* of Louis XIV, (Liv.I, Tit. II) defining the jurisdiction of the courts of admiralty in France: "VII. Connaîtront encore des dommages faits aux quais, dignes, jetées, palissades et antres ouv-rages faits contre la violence de la mer, et veilleront à ce que les ports et rades soient conservés dans leur profondeur et netteté." English translation: The Admiralty courts furthermore: "VII. Shall also have jurisdiction of damages done to quais, dikes, jetties, palisades and other works erected against the violence of the sea, and shall see to it that ports and roadsteads are maintained clear and of proper depth." Dunlap's Admiralty Practice, 1836 Ed., page 4.

Chief, supra, 12 How. at page 453, 13 L.Ed. 1058. Cf. Ordonnance de la Marine, note 9, supra.

Since the *Constitution* grants the federal courts jurisdiction over all cases of admiralty and maritime jurisdiction without exception, and since Congress has the power to make all laws which shall be "necessary and proper" for carrying into execution all powers "vested by this Constitution in the Government of the United States, or in any Department or Officer thereof", Art. 3, § 2; Art. 1, § 8, par. 18, "[t]here is nothing in that grant of jurisdiction * * * to preclude Congress from modifying or supplementing the rules of that law as experience or changing conditions may require. This is so at least with respect to those matters which traditionally have been within the cognizance of admiralty courts * * *." O'Donnell v. Great Lakes Dredge & Dock Co., 1943, 318 U.S. 36, 40, 63 S.Ct. 488, 491, 87 L.Ed. 596; Detroit Trust Co. v. Barlum S. S. Co., 1934, 293 U.S. 21, 42, 55 S.Ct. 31, 79 L.Ed. 176. The Belfast, 7 Wall. 624, 641, 19 L.Ed. 266.

The power of Congress to make any part of the general maritime law operative as law in this country has more than once been exercised by Congress and upheld by the Supreme Court. See, e. g., The Lottawanna, 1874, 21 Wall. 558, 22 L.Ed. 654; Richardson v. Harmon, 1911, 222 U.S. 96, 101, 106, 32 S.Ct. 27, 56 L.Ed. 110; and statutes and cases cited in Detroit Trust Co. v. Barlum S. S. Co., supra, 293 U.S. at pages 44, 45, 55 S.Ct. 31, 79 L.Ed. 176. Nor is the 1948 Act the first time that Congress has directed the federal courts, sitting in admiralty, to take cognizance of the specific issue of damages by ships to shore structures. In 1884 Congress extended the admiralty jurisdiction to proceedings for the limitation of liability so as to include damages by a vessel to a shore structure. Act of June 26, 1884, § 18, 23 Stat. 57, 58, 46 U.S.C.A. § 189. The Supreme Court upheld the Act in Richardson v. Harmon, supra, even though it considered the Act as an extension of admiralty jurisdiction to theretofore non-maritime torts. Cf. The Plymouth, supra. "The authority of the

Congress to enact legislation of this nature was not limited by previous decisions as to the extent of the admiralty jurisdiction. We have had abundant reason to realize that our experience and new conditions give rise to new conceptions of maritime concerns. These may require that former criteria of jurisdiction be abandoned, as, for example, they were abandoned in discarding the doctrine that the admiralty jurisdiction was limited to tidewaters." Detroit Trust Co. v. Barlum S. S. Co., supra, 293 U.S. at page 52, 55 S.Ct. at page 41, 79 L.Ed. 176.

■ We conclude that the Admiralty Extension Act of 1948, 46 U.S.C.A. § 740, was a constitutional exercise of the power of Congress under the *Constitution*. See American Bridge Co. v. The Gloria O, D.C. 1951, 98 F.Supp. 71.

### Retroactive Application of the Admiralty Extension Act

■ Since the accident giving rise to the damage claimed in suit occurred in December, 1946, over eighteen months before the enactment of the Admiralty Extension Act of June 19, 1948, we must consider what, if any, retroactive effect may be given to the statute. The cases cited by respondents to sustain their contention that the Act must be confined to a prospective application, are not applicable here, since those cases all concerned suits *against* the United States, not suits *by* the United States, nor suits between private parties. The distinction must be drawn because the United States, as a sovereign, is immune from suit except to the extent and under the conditions to which it gives its consent, United States v. Sherwood, 1941, 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058; Turner Terminals v. United States, 5 Cir., 1949, 177 F.2d 844, 846; and a waiver of sovereign immunity creates a new cause of action which has no retroactive effect unless specifically granted.

In Turner Terminals v. United States, supra, the Court of Appeals for the Fifth Circuit upheld the dismissal of a libel against the United States because the libelant had not complied with the condi-

tions under which the United States agreed to waive its sovereign immunity.[10]

The same distinction must be made in reference to the language of the district court in Vega v. United States, D.C. 1949, 86 F.Supp. 293, 294, quoted to us in respondents' brief: "Under the well established rule of statutory construction, it appears that Congress by making express provision for retroactive operation of the statute in but one class of cases intended the statute to operate only prospectively in all other cases". For the court was there speaking of "The provision of the statute governing suits against the United States" which it said "apparently was not intended to have retroactive effect, with one exception", i.e., "suits which could have been brought, but have 'not been hitherto filed under the Federal Tort Claims Act'." Title 46 U.S.C.A. § 740. The court then referred to the six months provision discussed in the Turner Terminals case, supra.

The district court did not consider the constitutionality of the Admiralty Extension Act in Portland Tug & Barge Co. v. United States of America, D.C.1949, 90 F.Supp. 593, 1950 A.M.C. 461, 462, "since it is always competent for the United States in a statute to permit suit against the Government in any claim whatsoever". The court then went on to hold that although the accident occurred in 1947, since the cause of action arose after June 19, 1948, and since suit had not been filed under the Federal Tort Claims Act, 28 U.S.C.A. §§ 1346, 2671 et seq., prior to that date, suit could be brought under the Admiralty Extension Act.[11] The court considered the Admiralty Extension Act as creating a new cause of action against the government.

However, we are concerned in the instant case with the jurisdiction of the district court to entertain a suit *by* the United States against private parties for damages *by* a ship *to* an extension of the land. (The decision reached on this point will also affect the district court's admiralty jurisdiction in cases between private parties arising from similar situations.)

The legislative history of the Admiralty Extension Act shows that there was some concern about the question of the retroactive application of the statute to the extent that it created new causes of action against the United States, and, therefore, specific provisions were enacted to restrict such retroactive effect. However, as to suits by the United States, it was stated that "Adoption of the bill will not create new causes of action. It merely specifically directs the courts to exercise the admiralty and maritime jurisdiction of the United States already conferred by article III, section 2 of the Constitution and already authorized by the Judiciary acts." 2 U.S.Code, Cong.Serv., 1948, 80th Cong., 2nd Session, pp. 1899, 1900, 1904.

The United States government in the instant case stated sufficient facts in its complaint in admiralty to support either a cause of action for a common law tort or for a maritime tort. The fact that a remedy at common law was available does not preclude a plaintiff from pursuing his remedies in the admiralty courts, for in such circumstances both the admiralty and common law courts have concurrent jurisdiction. Title 28 U.S.C.A. § 1333(1). The Admiralty Extension Act merely made a new remedy available for an already existing cause of action. All America Cables v. S. S. Dieppe, D.C., 93 F.Supp. 923, 1950

10. Title 46 U.S.C.A. § 740: "*Provided further*, That no suit shall be filed against the United States until there shall have expired a period of six months after the claim has been presented in writing to the Federal agency owning or operating the vessel causing the injury or damage."

11. Title 46 U.S.C.A. § 740: "Provided, That as to any suit against the United

States for damage or injury done or consummated on land by a vessel on navigable waters, the Public Vessels Act or Suits in Admiralty Act, as appropriate, shall constitute the exclusive remedy for all causes of action arising after June 19, 1948 and for all causes of action where suit has not been hitherto filed under the Federal Tort Claims Act: * * *."

618

A.M.C. 1863. The retrospective aspect of a new remedy does not make it objectionable for "[a]lmost every law, providing a new remedy, affects and operates upon causes of action existing at the time the law is passed." Sampeyreac v. United States, 1833, 7 Pet. 222, 239, 8 L.Ed. 665.

■ We conclude that the cause of action for damage to the dike is cognizable in admiralty even though the accident occurred prior to the passage of the Admiralty Extension Act.

### Other Points Raised

The government's second cause of action in which the Tug was libeled in rem for damages and penalties under the Rivers and Harbors Act of 1899, Title 33 U.S.C.A. § 407 et seq., for injuries to the dike is also within the admiralty jurisdiction of the district court under the reasoning set forth in this opinion, supra.[12]

■ There is no merit to respondents' contention that the government's libels be dismissed for misjoinder of causes of action. Both causes of action involve the same facts and parties, and are of a maritime nature. See Benedict on Admiralty, 6th Ed., Vol. 2, § 259. And since both causes of action arise out of a collision, the government may proceed in rem against the ship and in personam against the owners and master in the same suit. Admiralty Rule 14, 28 U.S.C.A.; Benedict on Admiralty, 6th Ed., Vol. 2, § 228.

Reversed and remanded.

12. We note that while the government in its first cause of action for a maritime tort to the dike alleged that . " * * * the said collision with Dike 67–1 * * * was proximately caused or contributed to by the joint negligence and fault of the said Tug Louie III, her owners, officers, operators and members of her crew, and the Westport Towboat Company, * * * and was also proximately contributed to [by] the carelessness, recklessness and negligence on the part of the SS William Harris Hardy * * * and W. K. Eckhart, as pilot, * * * ", the government did not, in its

second and *independent* cause of action for damages and penalties under the Rivers and Harbors Act allege any causal connection or use or employment of the Tug in the injury to the dike.

The trial court will, of course, observe that the statute providing for penalties specifically applies to damages to a "sea wall, bulkhead, jetty, dike, levee, wharf, pier, or other work built by the United States, or any piece of plant, floating or otherwise, used in the construction of such work under the control of the United States * * *." 33 U.S.C.A. § 408.