**UNITED GEOPHYSICAL COMPANY, Inc., and Firemen's Fund Insurance Company, Appellants,**

v.

**John VELA, Appellee.**

**John VELA, Appellant,**

v.

**UNITED GEOPHYSICAL COMPANY, Inc., and Firemen's Fund Insurance Company, Appellees.**

**No. 15723.**

United States Court of Appeals Fifth Circuit.

April 12, 1956.

Rehearing Denied June 4, 1956.

Wm. E. Wright, Andrew R. Martinez,
New Orleans, La., Terriberry, Young,

Rault & Carroll, New Orleans, La., of counsel, for appellants.

Albert Sidney Cain, John J. Finnorn, New Orleans, La., for appellees.

Before BORAH, TUTTLE and BROWN, Circuit Judges.

BROWN, Circuit Judge.

On September 18, 1947, the three luggers, King Bell, Lola Sara and Nellie L, each about 50 feet long, 17 foot in beam, 20 gross tons, were located in Breton Sound, off the southeast coast of Louisiana for the purpose of performing geophysical exploration work for their chartered owner, United Geophysical Company, Inc. A tropical hurricane had been brewing in the East Gulf for a few days, but all of the United States Weather Bureau Advisories prior to 12:15 noon September 18 limited Hurricane Warnings to the Florida Coast and the Warning that Small Craft should remain in port extended as far West as Mobile, Alabama, only. All of this was suddenly changed by the Advisory [1] of 12:15 noon September 18 predicting that the center of the Hurricane would strike the southeast Louisiana Coast and ordering Hurricane Warnings as far west as Morgan City, Louisiana. Breton Sound was in the middle of the predicted target area.

The Masters of these little vessels, consulting together in the light of the Advisory as well as recommendation broadcast by the Harbor Master of Gulfport directing all craft to leave the Gulf area for shelter inshore, concluded that they should seek haven at Fort St. Phillip, an old military post on the east bank of the Mississippi River and accessible from Breton Sound by Fort Bayou. By about 5:00 p. m. they reached their sanctuary. And well they did, for true to the Advisory, the hurricane of devastating force passed over Breton Sound about 5:30 in the morning of September 19 heading inland on a northwesterly course wreaking great havoc [2] in its path.

In determining whether the District Court's finding of fault against United Geophysical for damage to Vela's dock and adjacent structure at Fort St. Phillip is supported, it narrows our field considerably to eliminate altogether any suggestion of fault for having sought this haven. Vela did produce a practical boatman, having some familiarity with this area of swamps and interlaced bayous, who asserted, as a claimed expert, that it was a mistake to seek shel-

1. Advisory No. 31, 12:15 p. m. C.S.T., September 18: "Change to hurricane warnings west of Pensacola, Florida, to Morgan City, Louisiana. Center of hurricane located at 11:45 A.M., by reconnaissance flight at latitude 27 longitude 85 or about 195 miles south of Apalachicola, Florida. It is moving west-northwestward about 15 MPH. It is attended by winds of 80 to 100 MPH within 50 miles of the center and by gales within 200 miles of the center. Winds are increasing on the extreme Northwest Florida coast. Pensacola reports gusts of 52 MPH. Precautions should be taken against hurricane winds by all interests from extreme Northwest Florida to the southeast Louisiana coast. Indications are the center of the hurricane will be approaching the southeast Louisiana coast Friday forenoon. Hurricane warnings are now displayed from Cedar Keys, Florida to Morgan City, Louisiana."

2. Official Weather Bureau reports in evidence reflect that estimated damages in Louisiana were in the neighborhood of $24,000,000.00; in Mississippi, $29,000,000.00. Over 920 homes were destroyed, 11,668 damaged, 882 other buildings destroyed, 2,746 damaged. 42 boats destroyed, and 168 damaged. Deaths in Mississippi numbered 22 and 12 in Louisiana. One phenomenon of great significance here was that in addition to the strength and duration of hurricane force winds, the waters of the Gulf of Mexico were caught up by the hurricane winds and carried into the Mississippi Sound and elsewhere where they piled up on shore. To the east of Breton Island at Chandeleur Light, the water rose 14 feet and about 117 miles west at Morgan City, 6 feet. With this corroboration, the composite estimate by the witnesses in this case of a 9 to 10 foot rise at Fort St. Phillip is not to be doubted as a naturally extravagant exaggeration of this cataclysmic event.

ter in port, and that safety suggested that little boats ride out the storm in open water. If we thought that, through some sort of nautical rear view mirror, it was for us, not these Masters, to make this decision, the wisdom of seeking shelter was, by striking coincidence, amply demonstrated. United had another boat, Supreme Food No. Ten, which, because of draft, could not make the channel where the other three were made fast. When the blow was over, the Supreme Food No. Ten was high and dry on or near the main levee of the Mississippi River after having dragged her anchor an estimated one-fourth to as much as one and one-half to nearly six miles.

But navigation in these circumstances is left neither to Judges nor the Elder Brethren of Trinity House nor those who, in the garb of experts, from the security of a swivel chair now lay out the course with great conviction. "The master is the commander of the ship— lord of his little world. He is master in every sense of the word * * *". The Balsa, 3 Cir., 10 F.2d 408, 409. Whether he has bridge or quarterdeck to stalk, as long as he commands, he is master. It is the Master, then, who must make these decisions and who, clothed with great responsibility, enjoys the greatest and widest of good faith latitude in professional judgment. "The fundamental principle in navigating a merchantman, whether in times of peace or of war, is that the commanding officer must be left free to exercise his own judgment. Safe navigation denies the proposition that the judgment and sound discretion of a captain of a vessel must be confined in a mental strait-jacket. * * *" The Lusitania, D.C.S.D.N.Y., 251 F. 715, 728.

With the lives of their crew, and their own, hanging in the balance as their de- cision was wise or unwise, with the possibility of some character of property damage or loss bearing largely as one of the alternatives in the paramount concern for safety or life, the decision of whether to leave or ride it out, seek shelter and if so where, was by the necessities of a well-named cruel sea committed irrevocably to these Masters. Their decision was prudent. Indeed, it is not shown to have been wrong at all.

For sanctuary the vessels tied up in the stream which paralleled the general course of a concrete seawall surrounding the main installations of Fort [3] St. Phillip. This waterway thus ran through Vela's property which he had acquired through his purchase of the Fort in 1936 from the United States. The channel connected imperceptibly with Fort Bayou (sometimes called Plaquemine Bayou and by some thought to have been called Bayou Mardi Gras by Iberville). In all likelihood the channel was originally formed by the removal of earth to build up the levee immediately in front of the concrete seawall. But whatever its origin, it is certain that during governmental ownership it was dredged out to afford a channel depth of around 10 feet. It could and did sustain navigation and small commercial vessels, largely in the fish and oyster trade, or those seeking refuge from the weather, used it from time to time. The earthen levee, from the base of the seawall, declined to the water's edge, the vertical interval, as near as this record fixes it, being about 8 to 10 feet.

About 20 years before, Vela had built a structure made up of a small, light dock resting on a few small pilings on the water's edge approximately 4 feet in width and about 4 feet above mean low water; and just inshore of this and some 4 feet above it, a raised apron approxi-

---

3. The record and its preoccupation with ancient maps and charts, unfolds the per- fectly fascinating historical tradition of this Fort, built by the French about 1741, repaired by the Spanish around 1798, and important defense to the Port of New Orleans in the War of 1812 by its reputed destruction of a dozen British Men of War whose fallen dead likely lay buried in a forgotten cemetery, of service in the War between the States, the Spanish American War, its use in World War I, and its final abandonment in 1936 when its moats and Spanish Magazines afforded only operatic security.

mately 6 feet wide; and just inshore of this and on the same level, an oyster-picking shed. The covered shed was about 73 feet long, 23 feet wide, and it, and its 8 inch concrete floor, rested on pilings. It was separate from the docks. During oyster operations (which apparently had not been carried on for several years) the boats would land at the small dock, the oysters would be lifted by a hoisting boom to the upper dock apron and then moved into the shed. The southern end of the shed paralleled[4] the channel just below the point where channel and seawall made a 90-degree turn to the left. The channel in front of the dock ran northeast-southwest.

This corner was chosen because trees on the shore provided a means for fastening mooring lines, and the higher banks of the levee and the nearby buildings afforded considerable protection, not available elsewhere, from expected high winds and seas. To best be able to cope with predicted northeasterly winds, the vessels were turned around with their bows headed northeast. The King Bell was starboard side to the southern end of the small dock. On her port side was the Lola Sara, and next to her the Nellie L. Bow lines from each of the three vessels were put out ahead and to the levee. An anchor was thrown into the stream off the port quarter of the Nellie L. Stern lines ran from the Nellie L to the Lola Sara and to the King Bell, and two stern lines ran from the starboard quarter of the King Bell, one onto the ends of the piling of the small dock, the other to willow trees ashore.

The bow lines held securely and never parted, nor did those from the King Bell's stern to the shore. During the night, however, with mounting wind and water, stern lines between the Nellie L, Lola Sara and King Bell kept parting and were renewed as quickly and as often as the crew could. In a further effort to hold the vessels up, the engines on one or more of them were kept ahead from time to time. On the Nellie L, the engines were drowned out as water from rain, sea, and wind came in. Near four or five o'clock in the morning of September 19, the water gained close to 9 or 10 feet which put it then well over the small and apron dock. Somewhere near this time, a stern line from the Lola Sara to the King Bell parted, and since the Nellie L's port quarter anchor could no longer hold her off, the King Bell was carried to her starboard. When the blow was over, she was sitting upright with her bottom partly on the levee and partly on the piling of the apron dock or picking shed.

Perched as the King Bell was on his very pins, Vela claimed that this circumstantial evidence—too big to hide—was proof enough that the King Bell, not the hurricane, made his dock and shed collapse. United Geophysical insisted that, except possibly for slight damage to the flimsy small dock, physically the damage was actually done by the hurricane and if in some part physically caused by the vessels, then it was not so in the eyes of the law.

In the trial, all seemed preoccupied with the nature of the stream in which the boats tied up. Vela was intent on making it out an artificial canal and hence, he said, a private waterway imposing on the user the burdens of one akin to a trespasser. The defense, pressing hard the public character of the waterway, was seeking to establish first that this was a prudent port of refuge, which it clearly was, but, more extreme, that this made the bank and the levee freely available for use by all with a Codal right to destroy with impunity any " * * * works which have been * * * built * * * in the beds of * * * navigable streams, or on their banks, and which obstruct or embarrass the use of

4. While the dimensions do not jibe exactly with it, the builder's estimate put the distance from the normal water's edge to the closest water side of shed at some 24 feet. But since the shed was at the turn in the channel, only one corner was even adjacent to the stream.

these * * * streams, or their banks * * *." LSA–Civil Code, Art. 861; and see also Arts. 455, 458, 457; Chinn v. Petty, La.App., 163 So. 735; DeArmas v. New Orleans, 5 La. 132.

Neither extreme is acceptable. We think this waterway was public, certainly as a part of the navigable waters of the United States. That where it and Fort Bayou joined, it ran through private property, does not change its character or restrict the users of Fort Bayou from plying on through the same waters to the end. It was navigable in fact; it was navigable in law, McKie v. Diamond Marine Co., 5 Cir., 204 F.2d 132; and, its origin as an artificial channel with subsequent man-made improvements alter not its navigable, subservient character. See State ex rel. Lyon v. Columbia Water Power Co., 82 S.C. 181, 63 S.E. 884, 22 L.R.A.,N.S., 435; Ex parte Boyer, 109 U.S. 629, 3 S.Ct. 434, 27 L.Ed. 1056; Perry v. Haines, 191 U. S. 17, 24 S.Ct. 8, 48 L.Ed. 73.

Time and tide may wait for no man. But time (and Congress) has likely transmuted this from an ordinary diversity case with Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, making Louisiana the source of law into one which, presenting an alleged maritime collision now retrospectively within the admiralty and maritime jurisdiction of the United States, 1948 Amendment 46 U.S.C.A. § 740; United States v. Matson Nav. Co., 9 Cir., 201 F.2d 610; Vega v. United States, D.C. N.Y., 86 F.Supp. 293, makes the Federal Maritime Law the standard. Pope & Talbot v. Hawn, 346 U.S. 406, 74 S.Ct., 202, 98 L.Ed. 143. But whether tested by Louisiana or Federal Maritime Law, there is a clear policy in each to permit mooring along the banks of a navigable stream at least where it is done in refuge from catastrophic weather and with the exercise of reasonable care taking into account the tempestuous conditions and perils bearing on men's judgments and choices.

Faced with this impending storm of predicted but immeasurable violence, the considerations which approve the decision to seek shelter come into play in the selection of the precise place and the method of mooring. It was the threat of this hurricane striking them at sea which justified their going inside. But in shelter, they were still in its projected path. It was proper that with that mysterious and portentous force loose in the heavens, the Masters should choose the place where the vessels and crews would have the maximum protection. In that situation, on that public waterway, faced with those perils, the vessels had as much right to be where they were as did Vela's dock and structure. Reasonable care under those trying conditions was indeed imposed on the vessels, but if in the good faith judgment of their Masters, this was the spot best suited to afford protection against imminent peril, they did not need to withdraw to other places merely because the docks were nearby or might be damaged[5] as the storm lashed the vessels about.

And it is here that Vela's claim fails, for nought but the collapse of the structure and presence of this vessel in the midst of the wreckage is shown, and this is insufficient. United States v. Waterman Steamship Corp., 5 Cir., 190 F. 2d 499, 1951 A.M.C. 1291; Pacific Coast R. Co. v. American Mail Line, 25 Wash. 2d 809, 172 P.2d 226, 1946 A.M.C. 1340. As on any other plaintiff, the burden rested on him to show damage proximately caused by lack of due care.

Damage by the vessel is not even shown. When it is recalled that water

5. This was not the case of the dock or adjacent structure being used for a mooring or being damaged in the process. The stern line from King Bell to the small dock slipped off as the vessels rose with the water level. The damage to the shed if done by the vessels was due entirely to their being in waters facing on the dock but still separated by a considerable distance from the shed, see footnote 4, supra.

driven by winds of over 100 MPH rising to unprecedented heights above the level of both docks and near or over the shed floor was lashing with great fury at these old structures, and not a single witness did (or could) testify that the buildings collapsed upon, not before, being hit by the King Bell, the inferences at best are in balance.[6] Braithewaite Lands Liquidation Co., Inc., v. The Ben Hur Tug, 5 Cir., 212 F.2d 851, 1954 A.M.C. 897.

■ But assuming damage, nothing indicates lack of prudence. Seeking shelter was prudent, the place of shelter was prudent. What then was imprudent? There is no evidence to justify criticism of the Masters on *how* the vessels were moored. All bow lines and the King Bell's stern line to the shore held. To be sure, lines parted between the sterns of the three vessels and this may have been critical. But a vessel is not to be condemned simply because lines part in the face of nature's unrelenting violence or because men, braving these elements, cannot rectify the failure before damage is done.

■ The District Court's estimate of these conditions was no less severe than ours. His approach, however, was basically that it was negligent for these vessels to seek shelter at Fort St. Phillip. This was a misconception of the duties resting upon these Masters. The finding of negligence produces a result which leaves us with a feeling that an injustice has occurred, and, as such, being clearly erroneous, Fed.Rules Civ.Proc. rule 52(a), 28 U.S.C.A.; Galena Oaks Corp. v. Scofield, 5 Cir., 218 F.2d 217; Sanders v. Leech, 5 Cir., 158 F.2d 486, 487; United States v. U. S. Gypsum Co., 333 U.S. 364, 68 S.Ct. 788, 92 L.Ed. 746, it must be set aside and judgment rendered for appellants' United Geophysical Company, Inc., and Firemen's Fund Insurance Company. This automatically disposes of Vela's cross appeal concerning interest on the judgment now vacated.

Reversed and rendered.

On Petition for Rehearing.

PER CURIAM.

Whether governed by Louisiana or Federal Maritime law, the result would be the same. The petition for rehearing attacking primarily retrospective applicability of 46 U.S.C.A. § 740 is without merit.

It is ordered that the petition for rehearing be, and it is hereby denied.

---

6. The King Bell was abeam the southern end of the shed only, yet it all collapsed. Considering the destruction, it seems significant that no damage to the bow or starboard side of the King Bell's wooden hull was sustained. Offsetting this, Vela pointed to lack of damage to nearby houses on the reservation, but all of these were above the seawall and exposed to none of the pounding, turbulent waves unleashed by this angry, truant sea.