**BLOOMFIELD STEAMSHIP COMPANY
et al., Appellants,**

**v.**

**SABINE PILOTS ASSOCIATION et al.,
Appellees.**

**No. 17210.**

United States Court of Appeals
Fifth Circuit.

Jan. 9, 1959.

Rehearing Denied Feb. 14, 1959.

Robert Eikel, M. L. Cook, Houston, Tex., John G. Tucker, Orgain, Bell & Tucker, Beaumont, Tex., Royston, Rayzor & Cook, Houston, Tex., for appellants.

Clarence S. Eastham, Houston, Tex., Jep S. Fuller, Port Arthur, Tex., J. P. Forney, Jr., Houston, Tex., Fuller & Fuller, Port Arthur, Tex., Eastham, Dale & Forney, Houston, Tex., for appellees.

Before RIVES and TUTTLE, Circuit Judges, and WRIGHT, District Judge.

**J. SKELLY WRIGHT, District Judge.**

Appellants are owners and operators of ocean-going steamships engaged in commerce between foreign ports and the port of Beaumont, Texas. In their libel against the Sabine Pilots Association, and the individual members thereof, they seek to recover the difference in pilotage fees actually charged for piloting services to their vessels entering the port of Beaumont and what they say is the maximum charge allowed by statute.[1] The defense to the claim is that the statutory maximum applies only for

1. Art. 8274, Vernon's Ann.Revised Civil Statutes of the State of Texas.

piloting services as far as Port Arthur, and that vessels continuing up the Sabine Waterway to Beaumont may be charged an additional fee. We hold that the statutory maximum applies from sea to any port in the state, and that no additional pilotage charge may be legally assessed, except for moving a vessel further after she has arrived at a port of entry.

The Constitution of the United States empowers the Congress "To regulate Commerce with foreign Nations, and among the several States." Art. I, § 8, cl. 3. Pursuant to the power, Congress, in 1789,[2] granted to the several states the right to regulate pilotage "Until further provision is made by Congress." No further provision of importance was made by Congress in this area until the Act of February 28, 1871 which provided, and still provides, that " * * * and in no case shall the fees charged for the pilotage of any steam vessel exceed the customary or legally established rates in the State where the same is performed." 46 U.S.C.A. § 215. We are asked to determine whether defendants have been violating this congressional command by the exaction of pilotage fees in excess of the maximum established by state law.

■ Jurisdiction of the district court is predicated on 28 U.S.C. § 1337. That statute gives the court jurisdiction of any "proceeding arising under any Act of Congress regulating commerce." Contrary to the contention of appellees, a jurisdictional minimum amount in controversy is neither provided nor required.[3] The Texas statute which we must interpret is Article 8274 of the Revised Civil Statutes of the State of Texas which provides, in pertinent part: "The rate of pilotage, * * *, on any class of vessels shall not, in any port of this State * * * exceed Six ($6.00) Dollars for each foot of water which the vessel at the time of piloting draws

* * *." Originally the statutory maximum was $3.00. In 1866 it was increased to $4.00, in 1951 to $5.00 and in 1955 to $6.00, the present maximum.

When this maximum was first set by the Texas Legislature, Sabine Pass was the only port of consequence in the Sabine area. By cutting connecting canals, a major waterway serving numerous ports to the sea has been developed. Sabine Pass is 6 miles from the sea, Port Arthur is 19.1 and Beaumont is 48.4. In order to reach Beaumont, it is necessary to pass through Sabine Pass and Port Arthur. Under the Revised Civil Statutes of Texas,[4] the Board of Commissioners of Pilots for the Sabine District has regulatory powers over pilotage in the Sabine area, including the setting of rates. In its first schedule of rates published in 1928, this Board set a charge of $4.00 per draft foot to Sabine Pass, $4.50 to Port Arthur and later $5.00 to Beaumont. The Statutory maximum at the time was $4.00. In 1951 after the statutory maximum was raised to $5.00, the Board raised the rate to Port Arthur to $5.00, to Beaumont $6.00 to $8.00, depending on the gross tonnage of the vessel. In 1955, after the statutory maximum had been increased to $6.00 per draft foot, the Board set the pilot rates to Port Arthur at $6.00 and to Beaumont $7.00 to $9.50, depending on gross tonnage of the vessel.

It is significant that in its 1955 schedule, the Board, instead of showing the rates as applicable from sea to the named port, as was done in prior schedules, showed a rate from sea to Port Arthur equaling the statutory maximum, and then showed additional charges from Port Arthur to ports above on the Waterway. This change in language was probably prompted by an opinion of the Attorney General of Texas, dated May 20, 1955 and addressed to the Board, stating that "Your Board, therefore, is limited by the aforesaid Article to an allowance

2. 46 U.S.C.A. § 211.

3. Peyton v. Railway Express Agency, Inc., 316 U.S. 350, 62 S.Ct. 1171, 86 L.Ed. 1525; Turner, Dennis & Lowry Lumber Company v. Chicago, Milwaukee & St. Paul Ry. Co., 271 U.S. 259, 46 S.Ct. 530, 70 L.Ed. 934.

4. Arts. 8264–8280.

of $6.00 for each port which is visited by the vessel." The opinion goes on to say, however, that "We are of the opinion that the statutes mean that if, for example, a vessel was piloted into the port of Port Arthur, a charge of $6.00 per foot could be allowed; and if the vessel then was piloted to Beaumont, an additional $6.00 per foot charge could be allowed." It is noted that the Attorney General's opinion apparently indicates that an additional charge may be made, provided the vessel puts into Port Arthur before proceeding on to Beaumont. If that is what the Attorney General intended, there would be no problem with appellants here because they agree that, once a vessel puts into a port, an additional fee may be charged for moving her farther, either in that port or to another port. Their point is, however, that if the vessel proceeds from sea directly to Beaumont, for example, without stopping en route, the statutory maximum applies. Appellees, and the Port Commissioners, say that the maximum applies only as far as Port Arthur and that an additional charge may be assessed for pilotage to ports above that city.

The fact that Congress has seen fit to allow the several states to regulate pilotage in their ports should not be construed to mean that the national government has no interest in this important area affecting commerce with other nations. Quite the reverse is true. Congress has felt since the founding of this nation that her foreign commerce would best be served by state regulation of pilotage, subject, however, to certain safeguards which Congress itself may from time to time impose. The Act of February 28, 1871[5] was one of these safeguards. By passing this Act, Congress said to the states that only "customary or legally established rates"

for pilotage may be exacted and, by 28 U.S.C. § 1337, Congress imposed upon the federal judiciary responsibility for interpreting state law to determine whether the rates being charged were legally established. United States v. Bellingham Bay Boom Company, 176 U.S. 211, 20 S.Ct. 343, 44 L.Ed. 437. We proceed then to a consideration of the state statute establishing a maximum rate in an effort to determine whether the exactions in suit are in compliance therewith.

The text of the statute is clear and unambiguous. It states as plainly as language can that the rate of pilotage "on any class of vessels shall not, in any port of this state * * * exceed Six ($6.00) Dollars for each foot of water which the vessel at the time of piloting draws * * *." It makes no reference whatever to Port Arthur or any other named port. But counsel for appellees argue that the true interpretation of this statute lies, not in its language, but in its legislative history. Since no committee reports or legislative record, other than the statute itself, are available to assist in determining the legislative intent, appellees rely on the fact that the Port Arthur Pilot Commissioners have been promulgating, and the Sabine Pilots have been exacting, rates in excess of the statutory maximum for 27 years, and that during this time the statute in suit has been re-enacted, without significant amendment, three times. This, they say, citing numerous well-recognized authorities,[6] is legislative approval of administrative interpretation.

But in the cases cited by appellees, in which this principle was applied, the concerned statute was not clear and unambiguous on its face. The assumption of legislative approval of the administrative interpretation was indulged in an

---

5.  46 U.S.C.A. § 215.

6.  National Labor Relations Board v. Gullett Gin Co., 340 U.S. 361, 71 S.Ct. 337, 95 L.Ed. 337; Helvering v. R. J. Reynolds Tobacco Co., 306 U.S. 110, 59 S.Ct. 423, 83 L.Ed. 536; Alaska Steamship Co. v. United States, 290 U.S. 256, 54 S.Ct.

159, 78 L.Ed. 302; Costanzo v. Tillinghast, 287 U.S. 341, 53 S.Ct. 152, 77 L. Ed. 350; Fawcus Machine Co. v. United States, 282 U.S. 375, 51 S.Ct. 144, 75 L. Ed. 397; Stanford v. Butler, 142 Tex. 692, 181 S.W.2d 269, 153 A.L.R. 1054; Texas Jurisprudence, Vol. 39, § 141, p. 266.

effort to resolve ambiguity. Moreover, in all of those cases, it is shown either that the administrative interpretation had, prior to the re-enactment of the statute, court approval, or the administrative interpretation itself had been actually considered by the legislature in re-enacting the legislation. For example, in the Gullett Gin case, there was both legislative consideration as well as prior court approval of the administrative interpretation. Here there is neither. No court has approved the collection of pilotage charges in excess of the statutory maximum and nowhere is it shown that the legislature was aware of that practice.

It is true, as appellees suggest, that in several recent decisions of the Supreme Court, the legislative intent was sought in legislative history even where the language of the statute appeared unambiguous. In Universal Camera Corp. v. National Labor Relations Board, 340 U. S. 474, 489, 71 S.Ct. 456, 465, 95 L.Ed. 456, Mr. Justice Frankfurter stated that "the fair interpretation of a statute is often 'the art of proliferating a purpose', * * *, revealed more by the demonstrable forces that produced it than by its precise phrasing." And Mr. Justice Reed, in Vermilya-Brown Co., Inc., v. Connell, 335 U.S. 377, 388, 69 S.Ct. 140, 146, 93 L.Ed. 76, announced the principle that the court should interpret a statute as "the lawmakers, within constitutional limits, would have done had they acted at the time of the legislation with the present situation in mind."

This practice of psychoanalyzing the legislature, as Mr. Justice Jackson termed it,[7] has not gone unchallenged. The late Judge Jerome Frank, for the Second Circuit, in Marks v. Higgins, 2 Cir., 213 F.2d 884, 887, stated that "We think it has never been sound doctrine that a court may look at the text of an Act only when the legislative history is ambiguous." And this court has time and again emphasized that the most reliable indica-

tion as to what was on the legislative mind is what it wrote, and where the language used is unambiguous and in accord with the purpose of the legislation, it should be given effect. Interstate Natural Gas Co., Inc., v. Federal Power Commission, 5 Cir., 156 F.2d 949, affirmed 331 U.S. 682, 67 S.Ct. 1482, 91 L.Ed. 1742; United States v. Ogilvie Hardware Co., 5 Cir., 155 F.2d 577, affirmed 330 U.S. 709, 67 S.Ct. 997, 91 L.Ed. 1192; Creekmore v. Public Belt Railroad Commission of New Orleans, 5 Cir., 134 F.2d 576. Perhaps the clearest statement of this principle is by the Supreme Court itself in United States v. Public Utilities Commission, supra, 345 U.S. at page 315, 73 S.Ct. at page 717:

"Where the language and purpose of the questioned statute is clear, courts, of course, follow the legislative direction in interpretation. Where the words are ambiguous, the judiciary may properly use the legislative history to reach a conclusion. And that method of determining congressional purpose is likewise applicable when the literal words would bring about an end completely at variance with the purpose of the statute."

Applying this principle here, we find that the language of the statute in suit is clear and unambiguous, that it comports with the purpose of the legislation and that its language must be given effect as written. If we have not accurately read the mind of the Texas legislature, that body can quickly remedy the situation by drafting a statute clearly giving the Pilot Board and the Sabine Pilots the authority they have been assuming these many years. At least then the shipping industry will be in no doubt of the legal propriety of the pilotage charges and the requirement of 46 U.S. C.A. § 215 will have been met.

■ The plea of laches as to excessive charges prior to June 1, 1955 is well

---

7. In concurring in United States v. Public Utilities Commission, 345 U.S. 295, at page 319, 73 S.Ct. 706, at page 719, 97 L.Ed. 1020, Mr. Justice Jackson wrote:

"I should concur in this result more readily if the Court could reach it by analysis of the statute instead of by psychoanalysis of Congress."

made. It was not until that time, the effective date of the most recent rate schedule published by the Board of Pilot Commissioners, that the shipowners and operators became exercised over the excessive pilotage charges and began their protests. Neither admiralty nor equity will protect those who sleep on their rights.

Reversed and remanded.