**William W. STEINHORT and Mildred Steinhort et al., Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 20331.**

United States Court of Appeals
Fifth Circuit.

Aug. 11, 1964.

---

Simpson, District Judge, dissented.

Douglas W. McGregor, Houston, Tex., McGregor, Sewell, Junell & Riggs, Houston, Tex., of counsel, for petitioners.

John B. Jones, Jr., Acting Asst. Atty. Gen., Lee A. Jackson, Robert N. Anderson, Earl J. Silbert, Carolyn R. Just, Attys., Dept. of Justice, Louis F. Oberdorfer, Asst. Atty. Gen., Crane C. Hauser, Chief Counsel, Robert B. Alexander, Jr., Atty., I.R.S., Washington, D. C., for respondent.

Before HUTCHESON and BROWN, Circuit Judges, and SIMPSON, District Judge.

JOHN R. BROWN, Circuit Judge:

This case presents the old, old question of the tax deductibility of transportation

costs going to and from work.[1] More precisely, the question probably is what is the place of work? And does it matter that the "place of work" actually is a great number of physical places to and from which the wage-earner-taxpayer must intermittently go? All of these problems are presented by the decision of the Tax Court confirming the action of the Commissioner. By it the cost of transportation, including depreciation and operating expenses of a privately owned automobile, were disallowed to a Houston ship pilot insofar as they represented transportation from home to the first place of work and from the last place of work to home at the close of the day. The Commissioner and Court rec-

ognized, and allowed deduction for, all of the transportation costs between job sites during the day and also those to and from Galveston. For all practical purposes, the case is like Heuer v. Commissioner, 1959, 32 T.C. 947, aff'd mem., 5 Cir., 1960, 283 F.2d 865, upon which, without more, we might well affirm. But in view of the care with which the trial Court record was fully developed and the earnest argument pressed, we think the case warrants a discussion of the reasons which lead us to affirmance in principle.

Captain Steinhort, the Taxpayer,[2] is a Branch Pilot[3] appointed and commissioned under the laws of Texas, Arts. 8248–8256,[4] for the exclusive pilotage of all ships " * * * between the Gulf of

---

1. The relevant sections of the Internal Revenue Code of 1954 are:

26 U.S.C.A. § 162:

"§ 162. TRADE OR BUSINESS EXPENSES.

"(a) *In General.*—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

" * * *

* * * * *

"(2) traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business; * * *"

26 U.S.C.A. § 167:

"§ 167. DEPRECIATION.

"(a) *General Rule.*—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

"(1) of property used in the trade or business, or

"(2) of property held for the production of income. * * *"

26 U.S.C.A. § 212:

"§ 212. EXPENSES FOR PRODUCTION OF INCOME.

"In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year—

"(1) for the production or collection of income; * * *"

26 U.S.C.A. § 262:

"§ 262. PERSONAL, LIVING, AND FAMILY EXPENSES.

"Except as otherwise expressly provided in this chapter, no deduction shall be allowed for personal, living, or family expenses."

2. This record also covers the case of Captain J. E. McNary, a fellow Houston pilot. Each is joined, of course, by his wife as co-petitioner. The only distinction between the two cases is that Captain McNary lived in Channelview on the north side of the Ship Channel whereas Captain Steinhort lived in Houston on the south side of the Ship Channel.

3. The term is another of the lore of the sea, sea law and sea lawyers. "It appears that the word branch is used in England to signify the certificate held by a brother of the Trinity House, an association of mariners first chartered by Henry VIII. It is likewise the term applied to certificate given by the Trinity House to pilots who have passed an examination as to their competence. In England a branch pilot is the holder of such certificate." Houston Pilots v. Goodwin, Tex.Civ.App.1944, 178 S.W. 2d 308, 311, error dism'd. Here, of course, the Brethren of Trinity House are before us as litigants, not nautical assessors of starboardhand assistants to an admiralty judge. Calmar Steamship Corp. v. Scott, 1953, 345 U.S. 427, 432, 73 S.Ct. 739, 97 L.Ed. 1125, 1953 AMC 952; United Geophysical Co. v. Vela, 5 Cir., 1956, 231 F.2d 816, 819, 1956 AMC 745; Walker v. Harris, 5 Cir., 1964, 335 F.2d 185.

4. Vernon's Tex.Civ.Stat.Ann. arts. 8248–8256. Pilots of Navigation Districts are appointed by the District Commissioners under Arts. 8248–8257. The Governor appoints those for seaports. Arts. 8264–

Mexico and [the Port of Houston] as well as of intermediate stops or landing places for such boats upon navigable streams wholly or partly within * * * " the Harris County Houston Ship Channel Navigation District. Art. 8249.[5] Under this structure, vessels[6] bound from sea or from anchorage in Bolivar Roads into a terminal or pier within the geographical confines of the Navigation District[7] as well as all vessels within the District bound for sea or another port must have a Houston pilot aboard.[8] Likewise a pilot is required for shifting of a vessel from one terminal to another within the port.

■ There are 41 commissioned Houston pilots, organized as an unincorporated association. Citizens State Bank of Houston v. O'Leary, 1943, 140 Tex. 345, 348, 167 S.W.2d 719, 720. Pilotage—one of the oldest recognized monopolies, Olsen v. Smith, Tex.Civ.App. 1902, 68 S.W. 320, 321—is, however, a service supplied by the individual whose relationship toward the vessel is comparable to an independent contractor, Mobile Bar Pilots Ass'n v. Commissioner, 5 Cir., 1938, 97 F.2d 695. As such, the Pilots Association would have little, if any, liability for its performance. Houston Pilots v. Goodwin, Tex.Civ.App. 1944, 178 S.W.2d 308, 312; cf. Moody ex rel. United States v. Megee, 5 Cir., 1930, 41 F.2d 515, 1930 AMC 1677.

The deep water channel of the Houston Ship Channel terminates at the Turning Basin, approximately five miles from the heart of the downtown business center. The Channel, following Buffalo Bayou and the San Jacinto River, meanders for approximately 26 miles from the Turning Basin to Morgan's Point.[9] With the great expanse of business and industry within the Houston area, there has been a like increase in the number and types

8280. See O'Brien v. Amerman, 1922, 112 Tex. 254, 247 S.W. 270. These pilots also have federal licenses issued by the Coast Guard.

5. Pilotage rates are fixed by the Navigation District Commissioners, Arts. 8248, 8252, and 8274. See Bloomfield SS Company v. Sabine Pilots Ass'n, 5 Cir., 1959, 262 F.2d 345, cert. dismissed, 1961, 368 U.S. 802, 82 S.Ct. 20, 7 L.Ed.2d 15, after decision in the State Courts, Sabine Pilots Association v. Lykes Bros. SS Co., Inc., Tex.Civ.App., 1961, 346 S.W. 2d 166.

Under Arts. 8255 and 8274 for vessels and movements within the exclusive province of the state pilots, the vessel and her owners, after having first been "spoken" by a commissioned pilot are liable for half pilotage as a penalty if no pilot is taken or an unauthorized pilot acts. Olsen v. Smith, Tex.Civ.App.1902, 68 S.W. 320, 321. The unauthorized pilot is also liable to a civil penalty of $50, Arts. 8257, 8277.

For a discussion of the shipowner's liability for the acts of a compulsory pilot, see Homer Ramsdell Transp. Co. v. La Compagnie Gen. Transatlantique, 1901, 182 U.S. 406, 21 S.Ct. 831, 45 L.Ed. 1155.

6. There are certain tonnage exemptions, etc.

7. The District is called the Harris County Houston Ship Channel Navigation District. It was created and validated by Tex.Acts 1927, 1st called Sess., ch. 97, at p. 256. Certain lands were granted by the State to the District in Tex. Acts 1927, ch. 292, at p. 437. The District is coterminous with Harris County, and at the present time all of the facilities within the Port are at or above Morgan's Point.

8. Asserting the peremptory power to control interstate commerce recognized in Cooley v. Board of Wardens, 1851, 53 U.S. (12 How.) 299, 13 L.Ed. 996, Congress in 1871 enacted the forerunner of 46 U.S.C.A. § 215. See also 46 U.S. C.A. §§ 211–214, 364, and Anderson v. Pacific Coast Steamship Co., 1912, 225 U.S. 187, 32 S.Ct. 626, 56 L.Ed. 1047. The effect of this is to withdraw from state compulsory pilotage vessels under enrollment, that is in interstate or intracoastal commerce, leaving exclusively to state pilots vessels under registry, that is foreign and American vessels trading to and from a foreign port or place. But acting under Federal Coast Guard licenses, they pilot many exempt coastwise vessels.

9. It is approximately 51 miles from the Turning Basin to Bolivar Roads, an established anchorage, and about 7 miles further on from Bolivar Roads to the sea buoy. From Bolivar Roads a channel leads into Galveston Harbor to the west

of waterfront installations along the Channel. By geodetic charts, city and county maps, and supplemental oral testimony, this record accounts for 58 [10] specifically identified facilities, 55 of which are on, or adjacent to, the Channel between Morgan's Point and the Turning Basin.[11] The more important of these installations include, on the south side of the Channel, the Port Commission and another (Houston Ship Channel) leads northerly into the Port of Houston.

10. The charts show installations numbered as high as 63. But numbers 41–44 and 62 were missing.

11. Taxpayer's exhibits identified by number the following facilities. Approximate mileage figures are based on Taxpayer's oral testimony or where marked *, and estimated mileage based on the charts and maps in evidence.

| Facility Number | | | Approximate Miles From |
| South | North | Description | Taxpayer's** House |
|---|---|---|---|
| 1 | | Galveston Sea Buoy | 59.75* |
| 2 | | Bolivar Roads | 52.75* |
| 3 | | Galveston Harbor | 52 * |
| 4 | | Barbour Cut | 25.75* |
| | 5–7 | Humble Oil Baytown Docks | 26 |
| | 8 | San Jacinto Ord. Depot | 17 |
| 9 | | Diamond Chemical Co. | 13 |
| 10 | | Deer Park Shell Oil | 12 |
| | 11 | Greens Bayou | 9 |
| 12 | | Ethyl Corp. | 8* |
| | 13–16 | Todd Shipyards | 9 |
| 17–19 | | Phillips Adams Terminal | 8 |
| | 20 | Sheffield Steel | 7 |
| 21 | | Mathieson Chemical Corp. | 6 |
| | 22 | Hess Terminal | 7 |
| | 23 | Hess Terminal-2nd Berth | 9 |
| | 24 | Warren Petroleum Corp. | 9 |
| 25 | | General Am. Pasadena | 5* |
| 26 | | Crown Central Oil Corp. | 4* |
| | 27 | Texaco Galena Docks | 8* |
| | 28 | General Am. Galena Docks | 8* |
| 29 | | Sinclair Oil Docks | 3* |
| | 30 | Gulf Oil | 7* |
| | 31 | Clinton Docks | 8* |
| 32 | | Sinclair | 3* |
| | 33 | U.S. Gypsum | 6* |
| 34–36 | | Manchester Term. | 2* |
| | 37 | Southern Pacific Docks | 5* |
| 38 | | Signal Oil | 2* |
| | 39 | Naval Docks | 5* |
| 40 | | Signal Oil | 2* |
| 45 | | Old Manchester Docks | 2* |
| 46–47 | | Brady Island | 1* |
| 48–50 | | Long Reach Term. | 2* |
| | 51 | Public Wharf | 3* |
| 52 | | Long Reach Term. | 2* |
| | 53–54 | Public Wharf | 3* |
| 55 | | Long Reach Term. | 2* |
| | 56 | Public Wharf | 3* |
| | 57 | Grain Elevator | 3* |
| 58 | | Public Wharf | 2* |
| | 59 | Public Wharf | 3* |
| 60–61 | | Public Wharf | 2* |
| 63 | | Public Wharf | 2* |

** For convenience distances from the house of only one Taxpayer, Steinhort, see note 2, supra, are given.

Public Docks 1–4 (F. 58, 60, 61, 63) [12] at and near the Turning Basin, the eight or more berths of Long Reach Terminal immediately down channel (F. 48, 49, 50, 52, 55, 60, 61), Sinclair Refining Docks (F. 29), Crown Central Petroleum (F. 26), General American Docks (F. 25), Diamond Chemical (F. 9), Adams Terminal (F. 17, 18, 19), and Shell Refining (F. 10). And on the north side of the Ship Channel, these include, at and just below the Turning Basin, the Port Commission Public Wharves 8 through 25 (F. 51, 53, 54, 56, 59), the public grain elevator and dock (F. 57), Southern Pacific Docks (F. 37), U. S. Gypsum (F. 33), Gulf Oil (F. 30), Texaco Galena (F. 27), Warren Petroleum (F. 24), Hess Terminal (F. 22, 23), Sheffield Steel (F. 20), Todd Shipyards (F. 13), Port Commission Bulk Handling Plant Greens Bayou (F. 14, 15, 16), San Jacinto Ordinance Depot (F. 8), and the Humble Oil & Refining Company refinery and dock Baytown (F. 5, 6, 7).

Taxpayer has maintained a home for some time in the City of Houston at a point approximately 1½ miles southwest of the Turning Basin. During the weeks Taxpayer is on duty, he is subject to call 24 hours a day. The Pilot Association maintains an office staff including dispatchers. A Houston pilot receives instructions from the dispatcher as to the name and location of the ship, the scheduled time and the nature of the proposed ship movement, shifting to or from the sea buoy, to or from Bolivar Roads, or the like. It is not customary for the pilots to go to or by the Pilot Association's central office.[13] All of the piers, docks, terminals,[14] whether privately or publicly owned and operated, are fenced with controlled, guarded entrances. At many, the dockside itself will be as much as a half

mile from the entrance. There is no public transportation from Taxpayer's residence to the Turning Basin nor to the docks and other facilities along the Ship Channel. From the nature of the operation, many changes occur in proposed vessel movements. Cancellations of orders to a pilot and substitution of others by the dispatcher are frequent. As a pilot's workday begins, he does not know where or when he will be dispatched. Obviously, he has no idea how many miles he must travel or the sequence or order in which intermediate trips will be taken. For those in and around the Turning Basin, the trip is about a mile and a half (F. 60–61). For those on the north side of the Channel near the Turning Basin, the trip is in the neighborhood of three miles (F. 56, 57, 59). But docks at chemical companies and large major oil refineries run from five to eight miles (F. 17, 18, 19), to as much as 12 or 13 miles (F. 10, 9). For runs to facilities on the north side of the Channel, the distances are considerably greater because of the intervening cross channel highway route and the widely scattered location of these plants. Thus, from Taxpayer's home to the steel plant, petroleum terminals, the distance can easily be 6 to 9 miles (F. 20, 22, 23, 24, 27, 28), to the Ordinance Depot, 16 to 18 miles (F. 8). And considering the high tanker tonnage handled in the Port, a large number of 26-mile trips to the Humble docks at Baytown (F. 5, 6, 7) must be expected.[15]

The trip to and from the sea buoy or Bolivar Roads presents even more transportation problems. The Pilots Association owns and operates three vessels, two of which are in regular operation. One is a 64-foot personnel carrier to transport pilots from Pier 22 in Galveston Harbor to the boarding sea-

---

12. Parenthetical references to a number preceded by "F" refers to the numbered facilities listed in note 11, supra.

13. During the tax years in question, the office was located 8 miles further away from the Turning Basin than Taxpayer's residence. It has since been moved closer to the immediate Port area.

14. See note 11, supra.

15. If dispatched from Baytown docks to a facility on the south side of the Channel, Taxpayer has to take a circuitous route either by way of the Baytown Tunnel, the Pasadena Tunnel, or a return to a bridge crossing in Houston.

going pilot boat. The others are sea-going boarding boats.[16] A Houston pilot receiving instructions to bring a vessel in from the bar has to proceed by automobile to Galveston where he boards the small motor launch at Pier 22 which takes him to the sea-going boarding pilot boat. The boarding pilot boat then proceeds to sea to come alongside the inbound vessel. The pilot then brings the vessel to a terminal within the Port of Houston. On other occasions, the vessel, though bound next for Houston, will anchor in Bolivar Roads awaiting orders, etc. If so, the Houston Pilot leaves her there. On a downbound trip, the process is the reverse, the Houston pilot leaves at Bolivar Roads or the sea buoy, as the case may be, and goes by motor launch to Pier 22 for a return trip to Houston by automobile.[17]

Taxpayer on his annual returns deducted the full operating expenses and full depreciation[18] for the automobile used in this transportation to and from these facilities and his home and intermediate trips between such facilities. There is no dispute as to the fact that such amounts deducted were expended and the depreciation actually sustained. The Tax Court recognized that Taxpayer could "deduct the cost of going from one assignment to another and travel outside the Port of Houston area." Thus recognized was the right to deduct all transportation costs for inter-job-site shifts and the trips to and from Galveston. Allowance for these deductions was made in the form of a percentage by the Commissioner[19] which the Tax Court did not disturb for failure of specific proof.[20]

The Taxpayer here attacks the failure to allow the full deductions and specifically the disallowance of transportation to and from his home at the start and end of his day. Taking his text from the famous apothegm of Flowers[21] that "[b]usiness trips are to be identified in relation to business demands * * *," and the "exigencies of business rather than the personal conveniences and necessities of the traveler must be the motivating factors," 326 U.S. 465, at 474, 66. S.Ct. 250, at 254, the Taxpayer by a process akin to want-of-a-nail-the-shoe-was-lost approach demonstrates irrefutably that use of his automobile is absolutely necessary in his work. Thus, the argument continues, there is no public transportation and if there were, it would still not put him sufficiently close alongside the vessels to be boarded. The facilities are widely scattered at inaccessible locations which must be reached at, all hours of the day and night. And when, the 24-hour tour of duty starts, there is no practical way of knowing where the first, last, or intermediate jobs will commence or end. In the face of the peculiar nature of this particular employment,. he insists that the colorful language[22]

16. Among other "ordinary and necessary" business expenses is loss of, or damage to, pilot boats while going to or from duty station, see The City of Fort Worth (O'Brien et al. v. Southern Steamship Co.), 5 Cir., 1941, 118 F.2d 48, 1941 AMC 448.

17. Houston pilots may pilot only vessels bound next for Houston or for sea next after Houston. If bound by way of Galveston or Texas City, pilotage for such movement is for the Galveston bar pilots. Houston Pilots v. Goodwin, Tex.Civ.App. 1944, 178 S.W.2d 308, error dism'd.

18. The parties are in agreement that depreciation is deductible to the same extent as direct operating expenses.

19. Taxpayer Steinhort was allowed 40%, McNary about 60%.

20. The Court concluded: "Although some of the points to which petitioner traveled. were outside the Port of Houston area,. petitioners have not produced any evidence that would entitle them to a greater deduction than that allowed by" the Commissioner.

21. Commissioner of Internal Revenue v. Flowers, 1946, 326 U.S. 465, 66 S.Ct. 250,. 90 L.Ed. 203.

22. "A nation of city-hoppers and suburbanites though we may be, the Supreme Court has steadfastly refused to say that traveling expenses are incurred in the pursuit of business when they stem from the [taxpayer's] refusal to bring his home close to his job. The job, not the taxpayer's pattern of living, must require the travel." This language is cited.

of Carragan v. Commissioner, 2 Cir., 1952, 197 F.2d 246, 249, will not hold, or if holding, will compel deductibility of such transportation costs.

Unlike the situation of the true blue, metropolitan commuter who chooses for family and personal considerations to live in a far off suburb rather than a close-by city apartment, the Taxpayer here insists that there is no place where he could find to live which would eliminate the necessity of travel and the uncertainty of distance, location, and sequence of job-sites. The use of his private automobile does not therefore "stem from [his] refusal to bring his home close to his job." 197 F.2d 246, 249. We would agree that the use of the automobile comes from the job. It does not come from the Taxpayer's choice of one, rather than the other, place to make his home. Although to ascribe, as the Government's argument does, such transportation to the personal convenience of the Taxpayer, not business necessity, makes no-sense or non-sense as an operational fact, it is a long way from saying that it makes no tax sense.

■ Deeply ingrained in the whole tax structure—memorialized now by literally hundreds of tax rulings, Tax and other Court decisions in such numbers as to give some factual credence to what is so often pure fiction that Congress by legislative nonaction has put its imprimatur upon a settled administrative practice [23] —is the basic proposition that the cost of going to and from home and an established place of business is a nondeductible personal expenditure.

At times the pursuit of this approach brings about illogical and near absurd conceptual situations. But its predominant and redeeming grace is a sort of rough equality among all the millions of taxpaying, income-earning Americans who go—not as in scriptural days down to the sea in ships—but who go to and from their homes and their place of work. A lesser virtue is administrative uniformity.

Thus one can frankly acknowledge that the intellectual-business world would have a hard time branding as plausible the recognized rule as to, say, city doctors. With three likely beginning and ending destinations—office, house call, or hospital—it seems unrealistic that for purposes of nondeductibility of commutations, the "place of work" is the happenstance of the first and last call of the working day, although all other intramovements are deemed clearly to be ordinary and necessary business costs. And yet that is the rule we have recently approved and applied. Sapp v. Commissioner, 5 Cir., 1962, 309 F.2d 143, affirming mem., 1961, 36 T.C. 852; cf. Wolf v. United States, W.D.Mo., 1964, 64–1 U.S. T.C. par. 9211 [No. 13866–4, January 13, 1964].

To ameliorate some logical extensions of such illogic, the law, on the other hand, recognizes that differences in fact do make a difference. Thus, where state law compels a Justice to live in one but to work in another district, travel expenses are deductible, United States v. Le Blanc, 5 Cir., 1960, 278 F.2d 571; Emmert v. United States, S.D. Indiana, 1955, 146 F.Supp. 322, whereas, if done simply because the Judge does not want to move to the court's seat, there is no deduction. Barnhill v. Commissioner, 4 Cir., 1945, 148 F.2d 913, 159 A.L.R. 1210. Similarly, a journeyman, piccoloplayer-musician who must use a car because no public transport is available to beats where he will beat out his time bears the travel expense alone, whereas his contrapuntal colleague with bulky drums or a double bass viol gets a personal free ride from the transportation of this musical impedimenta. James A. Kistler, 1963, 40 T.C. 657, criticized as too restricted an interpretation of Rev.

with approval in Hammond v. Commissioner, 5 Cir., 1954, 213 F.2d 43, 44.

23. Reference to this notion is found in Flowers, 326 U.S. 465, 469–470, 66 S.Ct. 250; Helvering v. Winmill, 1938, 305 U.S. 79, 59 S.Ct. 45, 83 L.Ed. 52; Barnhill v. Commissioner, 4 Cir., 1945, 148 F. 2d 913, 159 A.L.R. 1210.

Rul. 63–100, 1963–1 Cum.Bull. 34, in Mertens, Federal Income Taxation § 25.96 n. 97.3, at 70 (April 1964 Supp.); Rice v. Riddell, S.D.Calif., 1959, 179 F.Supp. 576; but cf. Teague v. Riddell, S.D. Calif., 1959, 59–2 U.S.T.C. par. 9653. Likewise, where a construction worker obtains employment at a "temporary" place of work—temporary in the sense that a worker would not reasonably move his family to that area—travel costs are deductible.[24] On the other hand, those for jobs "intermediate" or "indefinite" in the reverse sense are not. Peurifoy v. Commissioner, 1958, 358 U.S. 59, 79 S.Ct. 104, 3 L.Ed.2d 30; Claunch v. Commissioner, 5 Cir., 1959, 264 F.2d 309.

■ Following Heuer,[25] the Tax Court pursues this general approach here to look upon the principal Houston Port area as the regular place of work. The cost of getting to and from home and the first and last job of the day within that area is personal "commutation," all other trips between facilities being fully deductible as ordinary and necessary business expense. As with other situations, this leads to some logical difficulties which simply have to give way to more practical considerations.

■ From the viewpoint of logic, the place of work is not really at these dock facilities. The place of work is the navigating bridge of a ship being conned. In that sense, it is just as logical to say the "place of work" is alongside a vessel six miles out in the Gulf at the sea buoy as it is to fix it at the first or last of these pier-side facilities, see note 11, supra. For that matter, as a proposition of logic alone, one could argue persuasively that a worker having places *A, B,* and *C* as regular destinations for the day's work, is going from home to *B* and then to *C* even though it is done after first stopping at *A* and *B* respectively. Yet the law neither is, nor permits itself to be, carried away by such logic. It recognizes, first, that where there are two or more established places of business, all costs of transportation between them is an ordinary and necessary business expense. William L. Heuer, Jr., 1959, 32 T.C. 947, affirmed mem., 5 Cir., 1960, 283 F.2d 865; Clarence J. Sapp, 1961, 36 T.C. 852, affirmed mem., 5 Cir., 1962, 309 F.2d 143; James A. Kistler, 1963, 40 T.C. 657; cf. Julian D. Freedman, 1961, 35 T.C. 1179, affirmed, 5 Cir., 1962, 301 F.2d 359; Chandler v. Commissioner, 1 Cir., 1955, 226 F.2d 467; Mertens § 25.96. Thus all inter-facility movements occurring after arrival at the first, until departure for home from the last facility within the Houston Port area, are deductible.[26]

**24.** Crowther v. Commissioner, 9 Cir., 1959, 269 F.2d 292; Wright v. Hartsell, 9 Cir., 1962, 305 F.2d 221; Matthews v. Commissioner, 9 Cir., 1962, 310 F.2d 98, reversing Mem. 1961, 36 T.C. 483; compare Leo M. Verner, 1963, 39 T.C. 749; United States v. Matthews, 9 Cir., 1964, 332 F.2d 597, 64–2 U.S.T.C. par. 9506 [No. 18,802, May 18, 1964], reversing D.Idaho, 1962, 213 F.Supp. 932; see also Rev.Rul. 60–189, Cum. Bull. [I.R.B. 1960–20, at 12]. As Mertens points out, Mertens § 25.93, at 270, our Flowers v. Commissioner, 5 Cir., 1945, 148 F.2d 163, reversed on other grounds, 1946, 326 U.S. 465, 66 S.Ct. 250, 90 L.Ed. 203, aligns us with the Eighth and Ninth Circuit view that "home" is where the home is, where a man customarily resides, not the so-called place of work, a concept not yet approved or passed on by the Supreme Court. Peurifoy v. Commissioner, 1958, 358 U.S. 59, 62, 79 S.Ct. 104, 3 L.Ed.2d 30 (dissenting opinion). Compare Burns v. Gray, 6 Cir., 1961, 287 F.2d 698.

Contrary to Taxpayer's insistence, the Ninth Circuit "travel" cases are of no real help to him here. The "temporary", "indeterminate" distinction, although of great use in determining deductibility of expenses under § 162(a) (2) where work is done in another district locality, does not cut into the principle of denying a deduction for "commuting expenses" for travel within the same metropolitan area as the taxpayer's established home.

**25.** Heuer v. Commissioner, 5 Cir., 1960, 283 F.2d 865, affirming mem. 1959, 32 T.C. 947.

**26.** Since it is beyond dispute that the automobile is absolutely essential in carrying on the business of being a pilot, the trip from the day's first facility (e. g., Baytown Terminal F. 5–7) to the facility where it will next be needed

Similarly, trips to and from Galveston are, as the Tax Court here recognizes, fully deductible without regard to the sequence of the trips and whether the first, last (or both) trip of the day. This is so whether the approach is that of the Tax Court and Revenue Service equating "home" with principal place of work or the 8th-9th-5th Circuit view (see note 24, supra) that "home" is home. On either test, these trips, and comparable ones, are away from home, meeting all of the requirements of § 162(a) (2) and Commissioner of Internal Revenue v. Flowers, 1946, 326 U.S. 465, 66 S.Ct. 250, 90 L.Ed. 203.

With practical considerations of this kind overriding the dictates of sheer logical consistency, it is not unreasonable to judge the activities of the pilots under like practical factors, including a comparison of pilots with other workers who must bear the cost of "commutation" travel alone.

Distance within the metropolitan area from Taxpayer's home is not alone any real distinction. Of course the distance may be great, running up to 25 or 30 miles.[27] But the maps introduced in evidence reflect what some of us otherwise know, that major residential areas such as those in the Memorial Drive region contain thousands of homes from which run-of-the-mill business and professional men have to travel 15 to 18 miles each morning and night to and from the heart of the business section. Others in the

southwest section in new residential developments skirting or paralleling super expressways must travel as high as 10 to 15 miles each way. That the sequence is irregular, requiring the pilot to go one day to one dock, the next day to one far removed is, likewise, of no determinative significance. Doctors, as we have already observed, have to do this.[28] Many other classes of workers must do the same. These include, for example, longshoremen loading and discharging vessels at many of these various dock facilities. Included, too, are skilled construction trade workers, carpenters, plumbers, roofers, painters who work one day in one area and shift clear across town the next as the old job ends and a new one opens up.[29] Nor does the combination of occasional long distances and irregularity in destinations really change the picture. To charge to the Taxpayer the first home-job trip and the last job-home trip as non-deductible "commutation," averages out over a period of a year or so to fix for a pilot, as it would for the doctor, the construction worker, the visiting nurse, or the peripatetic preacher, the approximate distance which must be traveled to get to and from the work. At the same time substantial equality with other undulating wage-earning-taxpayers is achieved.

█ We thus approve in principle, as we did in Heuer, the approach of the Tax Court. As the record does not contain evidence demonstrating that the Commissioner's percentage allowance[30] for

27. See, e. g., to Baytown F. 5–7.

28. Major hospitals are scattered from the center of the city, mid-downtown, clear out to the Medical Center, Compare Lenke Marot, 1961, 36 T.C. 238 (cardiograph operator).

(e. g., Manchester Terminal, F. 34–36) is business expense even though this is the means by which the Taxpayer's wife, acting as his driver, returns from the nondeductible "personal" commutation leg. Whether this would include any "excess" mileage for deviation to her home would depend on such factors as the reasonableness of this practice compared with, say, the expense of having a non-family chauffeur driver. Similar considerations of comparative reasonableness perhaps might allow full or partial deduction for trips to Taxpayer's home between assignments. Compare Williams v. Patterson, 5 Cir., 1961, 286 F.2d 333, which put to rest the "overnight" rule.

29. Perhaps treated differently would be the so-called outside route salesman who goes from place to place within a metropolitan area and who for some purposes at least has received special legislative treatment. § 62, 26 U.S.C.A. § 62(2) (D). See Mertens, Code Commentary §§ 62.6, 62.7.

30. See note 19, supra.

**506**

the deductible interfacility movements and those to and from Galveston are insufficient we could, as a technical matter, simply affirm the judgment. Our discussion indicates, however, that there are some factors articulated perhaps for the first time here, see, e. g., note 26, supra. Either one or both of the parties ought to be entitled to make whatever showing can be made if desired by them as to these elements which are admittedly deductible. The Judicial Code, 28 U.S.C.A. § 2106, and the Tax Code, 26 U.S.C.A. § 7482(c) (1), both recognize that the Court has the power, when appropriate, to direct a remand to permit the introduction and consideration of further evidence. In traditional civil litigation, this is even done occasionally where we remand for a new trial, partial or complete, even though we hold an instructed verdict should have been granted. See Gulf Oil Corp. v. Wright, 5 Cir., 1956, 236 F. 2d 46, 48; Duke v. Sun Oil Co., 5 Cir., 1963, 320 F.2d 853, 865, rehearing, 323 F.2d 518. We do not undertake to blueprint these supplemental proceedings on remand. This is left to the considered discretion of the Tax Court for its initial determination both as to the procedure to be followed and the extent, if any, to which such supplemental evidence permits or compels any change in the Tax Court's decision as to these deductible elements.

Affirmed and remanded for further proceedings not inconsistent herewith.

SIMPSON, District Judge (dissenting):

The majority opinion (page 498) states that "The Commissioner and (Tax) Court recognized, and allowed deduction for, all of the transportation costs between job sites during the day and also those to and from Galveston. For all practical purposes, the case is like Heuer v. Commissioner, 1959, 32 T.C. 947, aff'd mem., 5 Cir., 1960, 283 F.2d 865, upon which, without more, we *might* well affirm."

I find myself in accord with this, except that I would omit the word *might*, and simply say: "we affirm".

Heuer settled the contentions of the New Orleans Bar Pilots. The doctrine of *stare decisis*, to my mind, should settle, without more ado, the like contentions of Houston pilots. The disposition made by the majority, learned and thorough as it may appear to be, I view as no more and no less than a desertion of *stare decisis* standards for *ad hoc* standards. I was taught that a "red cow case", either for or against you, was dispositive. This premise, by which lawyers live and work and earn their bread, if not dead in this circuit, appears to be *in extremis*. I raise one small voice for its return to life and meaning.

The kind of judging done here, the abandonment of established precedent because individual judges disagree with it, leads only to confusion on the part of the bar and the district courts. It encourages increased litigation on both trial and appellate levels. No lawyer can advise his client what the law is; no District Judge or Tax Court Judge can rely with assurance upon precedent.

I served on this case by invitation of the Court of Appeals. Perhaps I should mind my manners and refrain from criticizing not only my betters, but my hosts as well.

But my invitation resulted from the overcrowded docket of the Court of Appeals for the Fifth Circuit, from its being overpowered by appeals in ever increasing numbers. I am persuaded that many of this Court's appeals occur only because the bar has by now caught the point and adopted the credo: never mind what the law was last week, let's see if it's not different next week. Far too often, without valid and compelling reason, it turns out to be different.

As a district judge then, I hope it is not a breach of civility and proper deference to voice this protest.

I respectfully dissent from all of the majority opinion which does more than affirm on the precedent of Heuer v. Commissioner, supra.