WILLIAM C. STARRETT, II, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Starrett v. Commissioner
Docket No. 13415-86
United States Tax Court
T.C. Memo 1990-183; 1990 Tax Ct. Memo LEXIS 202; 59 T.C.M. (CCH) 334; T.C.M. (RIA) 90183; April 9, 1990
William C. Starrett, II, pro se. Margaret Hebert, for the respondent. FEATHERSTONE
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined a deficiency in the amount of $ 37,718 in petitioner's Federal income tax for 1982, together with additions to tax of $ 6,538.50 under section 6659, [1] $ 1,885.90 under section 6653(a)(1), plus 50 percent of the interest due on $ 36,938 under section 6653(a)(2). After concessions by the parties the issues for decision are as follows: 1. Whether petitioner is entitled to a deduction of $ 481.51 per month under section 162(a) for the rental cost of a Cadillac automobile during 1982. *204 2. Whether petitioner is entitled to a deduction of $ 1,221.15 under section 162(a) for the cost of the transportation of a lawyer in petitioner's firm from the Los Angeles area to Iowa. 3. Whether petitioner is entitled to a deduction of $ 2,119.92 under section 280A for the cost of maintaining an office in his home. 4. Whether petitioner is entitled to deductions under sections 162(a) and 274 of $ 2,500 for the cost of a party in December and $ 800 for the cost of a party in July to which he invited some of his business associates and clients. 5. Whether petitioner is liable for the additions to tax imposed by section 6653(a)(1) and (2), for negligence in claiming a partnership loss. For convenience we shall combine the findings of fact and opinion. At the time the petition was filed, petitioner was a legal resident of Newport Beach, California. During 1982, petitioner was employed as a lawyer in the firm of Neben & Starrett, Inc. In his law practice, petitioner specialized in bankruptcy litigation. For 1982, petitioner reported a salary of $ 158,492 from the firm, together with other income. Pertinent to the present controversy, petitioner claimed on his return *205 a deduction of $ 8,810 for employee business expenses. The details of the deduction were not shown on the return; it was described only as "Promotion." In addition, petitioner claimed a loss deduction of $ 39,944 from an investment in Western Reserve Oil & Gas Co., Ltd. (Western Reserve), a limited partnership. In the notice of deficiency, respondent disallowed the employee business expense deduction for lack of substantiation. With respect to the Western Reserve loss deduction, respondent adjusted petitioner's return in accordance with the results of an audit of Western Reserve's partnership return, determining that the $ 39,944 loss deduction is not allowable, that petitioner's share of Western Reserve's income is $ 3,646, and that petitioner is liable for additions to tax, including the additions imposed by section 6653(a)(1) and (2). Although petitioner did not list the items composing the claimed employee business expense of $ 8,810 on his return, he testified at the trial that the deduction was composed of (1) the rental cost of an automobile, (2) the cost of sending an attorney to Iowa for a medical operation, (3) expenses related to an office in his home, and (4) the *206 cost of parties given in July and December for clients, attorneys, insurance company representatives, and others. 1. Automobile Expense
Under petitioner's arrangement with his law firm in 1982, the firm reimbursed him for all expenses incurred in operating an automobile used in carrying on his law practice but he had the responsibility to provide the automobile. Petitioner rented a Cadillac automobile which he used in his business at a cost of $ 481.51 per month and here asserts that he is entitled to a deduction equal to 12 times the monthly rental. The expense was documented by checks which petitioner furnished to the Internal Revenue Service during the course of the audit of his return. Petitioner testified that he had two Cadillac automobiles during 1982. One of the automobiles he used for non-business purposes. The other, he testified, he used exclusively in his law practice. He denied that he used this latter automobile to commute to and from his office or for other personal purposes. He testified that, instead of going directly to his office, he always drove to court, to the office of a client, or to some other place where he transacted business. Respondent *207 contends that the car rental expenses are not deductible. As stated in Fausner v. Commissioner, 413 U.S. 838, 839 (1973), "Congress has determined that all taxpayers shall bear the expense of commuting to and from work without receiving a deduction for that expense." See sec. 1.262-1(b)(5), Income Tax Regs. Accordingly, petitioner is not entitled to a deduction for the cost of his transportation to and from his office, his principal place of work. On the other hand, expenses for transportation between business locations may be deductible as ordinary and necessary business expenses under section 162(a). E.g., Steinhort v. Commissioner, 335 F.2d 496, 504-505 (5th Cir. 1964), affg. and remanding a Memorandum Opinion of this Court; Dancer v. Commissioner, 73 T.C. 1103 (1980). We are not convinced that petitioner used the rented automobile exclusively for business purposes. Petitioner gave no meaningful testimony on how he traveled from his office to his home. As to his travel from his home to his office, experience *208 teaches that courts do not convene every day at a regularly appointed time, that no one lawyer is involved in every case before a court, and that during the course of a trial a lawyer needs access to his office for last minute research, collection of papers, interviews with witnesses, and the like. Yet we are convinced that petitioner used his automobile for business purposes a considerable amount of time. Based on all the evidence, we find that approximately one third of his use of the automobile was for his business purposes. Petitioner is entitled to a deduction of $ 1,900 with respect to the use of the automobile. Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930). 2. Transportation of attorney to Iowa
Petitioner testified: And I find a third check stub in the sum of $ 1221.15 which was a check written by me in order to send one of my lawyers back to the University of Iowa so he could have his stomach worked on because of excessive weight, that I advanced on behalf of the law firm. Because petitioner advanced these funds "on behalf of the law firm," he did not incur the expenditures in carrying on his trade or business as an employee under section *209 162(a) and is not, therefore, entitled to the deduction. Rink v. Commissioner, 51 T.C. 746, 752 (1969); Koree v. Commissioner, 40 T.C. 961, 965-966 (1963). If petitioner was entitled to reimbursement for the expenditure but failed to claim reimbursement, his expenditure was not "necessary" under section 162(a) and thus cannot qualify for the deduction. Orvis v. Commissioner, 788 F.2d 1406, 1408 (9th Cir. 1986), affg. a Memorandum Opinion of this Court; Coplon v. Commissioner, 277 F.2d 534, 535 (6th Cir. 1960), affg. a Memorandum Opinion of this Court; Podems v. Commissioner, 24 T.C. 21, 22-23 (1955). 3. Home office
In addition to the office provided by his law firm, petitioner maintained a 20' X 14' room in his home where he did some of his legal work. For this home office, petitioner deducted $ 2,192.90 which represented, according to petitioner, the rental value of the room. Section 280(A)(a) prescribes the general rule that no otherwise allowable deduction "shall be allowed with respect *210 to the use of a dwelling unit which is used by the taxpayer during the taxable year as a residence." Under section 280A(c)(1)(A), this general rule does not apply to any item to the extent such item is allocable to a portion of the dwelling unit which is exclusively used on a regular basis as "the principal place of business for any trade or business of the taxpayer." Petitioner does not qualify for this exception because his principal place of business was his office at his law firm, Soliman v. Commissioner, 94 T.C. Jan. 18, 1990, and we do not understand that petitioner contends that his office at the law firm was not his principal office. Thus, petitioner is not entitled to the deduction. As we understand petitioner's position, it is that section 280A was not effective for 1982, the year here in controversy, and that the previously applied "appropriate and helpful" standard applies. See, e.g., Newi v. Commissioner, 432 F.2d 998, 1000 (2d Cir. 1970), affg. a Memorandum Opinion of this Court; Bodzin v. Commissioner, 60 T.C. 820, 825 (1973), revd. 509 F.2d 679 (4th Cir. 1975). Section 280A, however, was enacted as part of the *211 Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520. The provision was made effective for taxable years beginning after December 31, 1975. The section was, therefore, applicable for 1982 and the disputed deduction is not allowable. 4. Entertainment Expense
We next consider petitioner's expenditures for two parties during 1982, which petitioner labels "business promotions." The first party was during the Fourth of July weekend and attendees, according to petitioner, included named attorneys and clients. Petitioner estimated his cash expenses at $ 800. The second party was a "Christmas open house" stretching from December 24, 1982, to January 2, 1983, with attendees again, according to petitioner, including named attorneys and clients. Petitioner estimated his expenses at $ 2,500 for the second party. Deductible entertainment expenses must be "ordinary and necessary expenses" paid or incurred in carrying on a trade or business. Sec. 162(a). A taxpayer generally may not deduct expenses incurred for the benefit of another. Deputy v. duPont, 308 U.S. 488, 493 (1940); *212 Noland v. Commissioner, 269 F.2d 108, 111 (4th Cir. 1959), affg. a Memorandum Opinion of this Court. Thus, as we have noted above, an employee who voluntarily incurs expenses of the employer is not entitled to a deduction for such expenditures because they are not considered necessary employee expenses. Westerman v. Commissioner, 55 T.C. 478, 482 (1970); Stolk v. Commissioner, 40 T.C. 345, 356-357 (1963), affd. per curiam 326 F.2d 760 (2d Cir. 1964). On the other hand, expenditures required by the employer as a condition of employment may be deductible. Fogg v. Commissioner, 89 T.C. 310, 318 (1987). Deductible entertainment expenses must also meet the requirements of section 274. Entertainment expenditures generally must be directly related to, or at least associated with, the active conduct of the taxpayer's trade or business. Sec. 274(a)(1). An expenditure is directly related to the active conduct of a trade or business if, among other things, (1) the taxpayer has more than a general expectation of deriving a specific business benefit at some future time, sec. 1.274-2 (c)(3)(i), Income Tax Regs. *213 ; and (2) the taxpayer actively engages in business during the period of entertainment, sec. 1.274-2(c)(3)(ii), Income Tax Regs. To fall within the "associated with" standard, the entertainment must directly precede or follow a substantial and bona fide business discussion. Sec. 274(a)(1)(A). On this record petitioner has failed to establish that he is entitled to deductions for these entertainment expenditures. Petitioner has not shown that these amounts were ordinary and necessary to his trade or business of serving as an employee, as required by section 162(a), nor has he made any showing that relates to the specific requirements of section 274. Accordingly, these entertainment expenditures are not deductible. 5. Additions to tax for negligence
As to the additions to tax, this Court in Ferrell v. Commissioner, 90 T.C. 1154 (1988), held that Western Reserve was not engaged in a trade or business within the meaning of section 162(a) and that the whole partnership arrangement lacked economic substance. Most of the deductions claimed by the partnership as well as the partnership loss deductions passed through the partnership *214 to the partner-investors were not, therefore, allowable. Petitioner in this proceeding does not contest that holding, limiting the issues to the applicability of the section 6653(a)(1) and (2) additions to tax. Western Reserve was a tax shelter organized and promoted by Trevor Phillips (Phillips) and Terry Mabile (Mabile), neither one of whom had any oil and gas business experience. Only individuals in the 50-percent income tax bracket were eligible to invest in the partnership. The shelter scheme was designed to work as follows. As a limited partnership, Western Reserve's declared purpose was to acquire oil and gas leases, develop them, and produce and sell oil and gas. Investors in the partnership were to pay cash of $ 1,000 for each unit of interest and were to make a minimum cash investment of $ 10,000. In addition, each investor was to sign two nonrecourse notes payable within 12 and 24 months, respectively, each in the face amount of the cash investment, and three long-term purportedly recourse notes, each in an amount equal to four times the cash investment. The three long-term notes were payable within 19, 20, and 21 years, respectively. The promotional material emphasized *215 that the long-term notes, though purportedly recourse obligations, would be converted to nonrecourse obligations or paid from oil and gas production. The documentation called for the creation of Magna Energy Corp. (Magna), whose stock was to be owned 95 percent by Mabile and 5 percent by a William Brannan. Magna was to locate and acquire oil and gas leases and then assign them to Western Reserve without retaining any interest therein. In practice, Western Reserve paid for the leases and acquired them directly from the owners. Purportedly, as consideration for the assignments, Western Reserve was to give Magna three long-term promissory notes, respectively payable within 19, 20, and 21 years from the end of the investment year. The amounts of these long-term notes were to be unrelated to the value of any leases acquired during the year but were to be equal to four times the amount of the cash paid in by the investors in that year. Thus, Western Reserve acquired an interest in only one lease in 1981 at a cost of only $ 4,000 but, at the end of the year, gave Magna three notes, each for $ 20,584,000 (four times the partners' total 1981 cash investment), a total of over $ 61,000,000. *216 Western Reserve acquired interests in four leases in 1982 at a cost of approximately $ 40,000 to $ 48,000 and entered into five exploration agreements with a commitment figure of $ 92,000; Western Reserve gave Magna three notes, each for $ 38,760,000, a total of over $ 116,000,000. These notes for both years were purportedly secured by the investor-to-Western Reserve notes described above. The long-term Western Reserve-to-Magna notes were described as advance minimum royalties. Western Reserve had adopted the accrual method of accounting. Western Reserve was to deduct as advance royalties the face amount of one of the long-term notes in the year in which associated investments were made by the investors and the face amount of one of the other two notes in each of the next two following years. Because the face amount of each of the three Western Reserve-to-Magna notes was to be equal to four times the total amount of the cash investment for the year, an investor was represented in the promotional material as entitled to deductions of $ 12 for each $ 1 invested, i.e. $ 4 for $ 1 in each of three years. The Western Reserve promoters made liberal provisions for themselves which *217 alone, in ordinary circumstances, would foreclose the long-term success of the venture. Following a detailed analysis of the provisions for the payments to be made to the promoters, the arrangements are summarized in Ferrell v. Commissioner, 90 T.C. at 1184-1185, as follows: Thus, Phillips and Mabile, neither one of whom had any oil and gas business experience, took more than 20 percent (15 percent to Mabile as sales commissions and 5-1/2 percent to Phillips * * * as fees) of the total investments by Western Reserve's limited partners, leaving less than 80 percent available for use in the business. In addition, they created a mechanism for siphoning 65 percent of the gross receipts to themselves [after discharging the nonrecourse notes], 30 percent to Phillips and 35 percent to Magna [95 percent owned by Mabile], until the Western Reserve-to-Magna notes in the face amount of $ 118 million were paid. This leaves only 35 percent of the gross receipts for the payment of severance taxes, all overhead, production, operating and other expenses, and any subsequent lease acquisitions and drilling expenses. Western Reserve's partnership returns for 1982 and *218 1983, the only years for which there was any operating experience, show that the cost of goods sold alone ($ 56,488 for 1982 and $ 1,285,018 for 1983) far exceeded 35 percent of the gross receipts ($ 121,321 for 1982 and $ 1,338,670 for 1983) from oil and gas production. These cost of goods sold figures do not include the long list of deductions shown in our findings. [Emphasis in original; fn. ref. omitted.] Western Reserve deducted as advance royalties $ 20,584,000 in 1981 and $ 59,344,000 ($ 20,584,000 plus $ 38,760,000) in 1982 and passed through to the investor-partners the losses created by those and other deductions. As noted above, respondent disallowed the loss deduction, determining, among other things, that petitioner is liable for the section 6653(a)(1) and (2) additions to tax. Section 6653(a)(1) and (2) provides for additions to tax if any part of an underpayment is due to negligence or intentional disregard of rules and regulations. Negligence is lack of due care or failure to do what a reasonable and ordinarily prudent person would do in the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985); *219 Rybak v. Commissioner, 91 T.C. 524, 565 (1988). Petitioner maintains that he acted prudently in making his Western Reserve investment of $ 10,000 in cash and claiming the Western Reserve loss on his 1982 tax return. We do not agree. Petitioner's litigation work as a bankruptcy lawyer gave him experience in analyzing the financial condition of allegedly bankrupt organizations and the economic viability of corporations attempting to survive bankruptcy (Chapter 11) reorganizations. Petitioner testified: Did we go in and investigate in the detail to which we would advise a client, whether to do a chapter 11? No, we did not. Would we tell a client who sought to make an investment of this magnitude to do much more than what we did, that answer also probably would have been no. Petitioner seeks to show that he acted reasonably and prudently in making the Western Reserve investment by testimony that his law partner consulted Albert Destro (Destro). Destro was not a certified public accountant but was a retired revenue officer who prepared tax returns. After a series of telephone calls, Destro reported back to petitioner that the people promoting Western Reserve *220 were "okay" and "as far as he knew, the investment was within the parameters as allowed and as was represented to us." Thus, Destro personally made no analysis of Western Reserve, even assuming he was competent to do so, but relied upon the telephone advice of some unknown individuals whose personal interest and motives have not been shown. Petitioner also testified that Phillips and Mabile, the Western Reserve promoters, hardly a source of objective advice, were consulted. There is no evidence that petitioner gave any consideration to the unique Western Reserve arrangement calling for advance royalties unrelated to either production or the value of the leases, or the provision for siphoning gross receipts to the promoters. Although petitioner made his investment in December 1982, after Western Reserve had been in operation for a year, he made no effort to inform himself of Western Reserve's operating loss of $ 20,000,000 for 1981 and purported accumulated indebtedness of over $ 60,000,000. Petitioner testified that his conclusion that the Western Reserve arrangement was bona fide was based on his opinion that the long-term notes he signed were enforceable. But those notes were *221 not payable until 20 years after the investment and, therefore, had little practical meaning. The promotional material explained that the notes were required to be recourse obligations for tax reasons and assured the investors that the notes would be paid from production. The partnership agreement authorized Western Reserve's general partners, in their discretion, to convert the recourse notes to nonrecourse obligations and authorized the investors in given circumstances to cancel their obligations. We adhere to our opinion in Ferrell v. Commissioner, 90 T.C. at 1197, that there was no intention "to enforce the payment of any of the long-term, purportedly recourse notes." Petitioner has failed to show that he was not negligent in preparing and filing his 1982 Federal income tax return on which he claimed a deduction for the Western Reserve loss. No reasonable person with petitioner's business, legal, and investment experience would have expected the Western Reserve scheme to work. Hanson v. Commissioner, 696 F.2d 1232, 1234 (9th Cir. 1983), affg. a Memorandum Opinion of this Court; McCrary v. Commissioner, 92 T.C. 827, 849-850 (1989). *222 It was unrelated to economic reality. Taxwise, it was too good to be true. It was an obvious and flagrant tax avoidance scheme. Petitioner is liable for the section 6653(a)(1) and (2) additions to tax. Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, section references are to the Internal Revenue Code of 1954, as amended and in effect for the year at issue.↩